STATE OF NORTH DAKOTA, Doing Business as the North Dakota Mill & Elevator Association, and the North Dakota Terminal Exchange, etc., Complainants and Respondents, v. GREAT NORTHERN RAILWAY COMPANY et al., Defendants and Appellants.

(219 N. W. 295.)

**Warehouses — state-owned mill and elevator — a public terminal grain elevator.**

1. The state-owned mill and elevator, together with the equipment, trackage and other facilities thereof in Grand Forks, North Dakota, is in law and fact a "public terminal grain elevator and subject to regulation as such."

**Carriers — milling, stoppage, cleaning, mixing and storing grain in transit may be required under proper conditions.**

2. "Milling in transit," "stoppage in transit," "cleaning, mixing and storing in transit," are lawful services which may be required from transportation companies under proper conditions and are not mere privileges to be granted by transportation companies on their own volition.

**Carriers — services cannot be required without compensation.**

3. Such service cannot be required of transportation companies without adequate compensation therefor.

**Carriers — powers of state board of railroad commissioners.**

4. The board of railroad commissioners of the state of North Dakota has the power and authority to determine when and where such service shall be rendered, and the duty of determining primarily what is an adequate compensation therefor.

**Carriers — evidence sustains board of railroad commissioners as to adequate compensation.**

5. The record examined and it is held that the decision of the board of railroad commissioners that 1 cent per cwt. is an adequate compensation for "cleaning, mixing and storing in transit" service required of transportation companies at the public terminal grain elevator is sustained by the evidence taken.

Opinion filed March 21, 1928.   Rehearing denied May 21, 1928.

Carriers, 10 C. J. § 796 p. 499 n. 61, 62.   Warehousemen, 40 Cyc. p. 402 n. 21.

From an order and judgment of the District Court of Burleigh County affirming the order and judgment of the board of railroad commissioners, defendants appeal, *Coffey, J.*

Affirmed.

*O'Hare & Cox* and *R. J. Hagman,* for appellants.

The governmental authority vested in the board of railroad commissioners "combines administrative, legislative and judicial functions" and its action must be "consonant with due process of law." State v. Chicago & N. W. R. Co. 46 N. D. 313, 179 N. W. 378.

A public utility company has an absolute right to judicial review of any order which may be made affecting its interests, that on an appeal the validity and lawfulness of the commission's orders must be determined by the evidence contained in the record certified to the court, and in reviewing such orders the court must exercise its own independent judgment upon such facts and the law applicable thereto. State ex rel. Hughes v. Milhollan, 50 N. D. 184, 195 N. W. 292.

"The order may be vacated as unreasonable if it is contrary to some provision of the Federal or state Constitution or laws, or if it is beyond the power granted to the commission, or if it is based upon some mistake

of law, or if there is no evidence to support it, or if, having regard to the interests of both the public and the carrier, it is so arbitrary as to be beyond the exercise of a reasonable discretion and judgment." State v. Great Northern R. Co. (Minn.) 153 N. W. 247.

The railroad commission cannot lawfully base its orders on matters not in evidence and all evidence on which it acts must be a part of the record. State ex rel. Hughes v. Milhollan, 50 N. D. 185, 195 N. W. 292.

The courts will set aside a mistake, of the commission based upon a mistake of law. Interstate Commerce Commission v. Union P. R. Co. 222 U. S. 541; United States v. New York C. R. Co. 263 U. S. 603.

*Harrison A. Bronson* and *T. C. Madden,* Assistant Attorney General, for respondents.

The statute provides for an appeal to the courts to review orders of the commission. Laws of 1919, § 35, chap. 192.

When appeal is had, the court exercises an appellant jurisdiction. Re Minneapolis, St. P. & S. Ste. M. R. Co. 30 N. D. 221, 152 N. W. 513.

Upon such appeal the question for review is the lawfulness of the decision or final order of the Commission. Laws of 1919, § 35, chap. 192.

The question to be reviewed must be considered upon the record made before the commission. Section 35, chap. 192, Laws of 1919.

"That on appeal the validity and lawfulness of the orders must be determined by the evidence contained in the record certified to the court; and that in reviewing such orders the court must exercise its own independent judgment upon such facts and the law applicable thereto. It is unnecessary to determine what effect, if any, the district court ought to give to the findings of the commissioners on disputed questions of fact, when it is considering an appeal from a commissioner's decision." State ex rel. Hughes v. Milhollan, 50 N. D. 194, 195 N. W. 292.

"A shipper is entitled to a reasonable rate, and one of the tests of a reasonable rate is its relationship to other rates on the same or analogous commodities between points in the same. general territory for similar distances." Nagase & Co. v. Director Gen. 62 Inters. Com. Rep. 422.

BURR, J. This is an appeal from the judgment of the district court

affirming an order of the board of railroad commissioners of the state of North Dakota. In November 1925 the respondents filed a complaint with the board of railroad commissioners in and for North Dakota and in this complaint recited the history and development of the "basic industry of the producers of the state of North Dakota, as well as of all citizens of the state directly or indirectly connected therewith," showing the geographic and economic features incident to the marketing and distribution of the agricultural products in relation to the country at large, and setting forth the problems of transportation, cleaning, and other factors in marketing. The complaint then sets forth that the defendant railroads are the chief machinery in the transportation problem and that under the economic conditions in this state there have grown up fixed terminal markets in the state; that in addition thereto the legislature of this state, by chapter 217 of the Session Laws of 1925, enacted: "The state-owned mill and elevator, located at or near the city of Grand Forks, North Dakota, is hereby declared to be a public terminal grain elevator and subject to regulation as such." The complaint further shows that by the same statute the board of railroad commissioners for this state is "authorized, empowered and required to determine and fix the intrastate rates for the transportation of all grain and grain products moving to or from such public terminal grain elevator within the state of North Dakota." The complaint further alleged that the defendant railroads had already established rates and that the rates so established are unreasonable and therefore the complainants pray that:

"The board of railroad commissioners initiate and conduct an investigation and a hearing under and pursuant to chapter 217 of the Laws of North Dakota for the year 1925, and as otherwise provided by law, and that defendants may be severally required to participate in' such investigation and hearing and to answer the petition and complaint herein and that, after due investigation and hearing, such findings and orders be made, and proceedings had, that, upon and for the transportation of all grain and grain products moving to or from said terminal or within said terminal, at Grand Forks, intrastate rates will be just, reasonable, and free from discrimination and confiscation in their character, that the said terminal at Grand Forks be recognized, found and adjudicated to be a terminal in fact, ready, able and equipped to serve as a terminal for the grain of this state tributary thereto, and that the acts

of discrimination, confiscation, unjust and unreasonable rates and practices, of which complaint as hereinbefore set forth, be removed."

Each of the defendants answers. The Great Northern Railroad Company and The Farmers Grain and Shipping Company deny the allegations of the complaint except that they admit they are "common carriers engaged in transportation of freight and passengers between points in North Dakota, and that they publish rates on grain and transit and other privileges in the tariffs referred to."

The Minneapolis, St. Paul & Sault Ste. Marie Railway filed its answer, stating:

"That it is a common carrier subject to the Interstate Commerce Act and also subject to the regulation on intrastate business by the Railroad Commission Act of the state of North Dakota.

"Further answering, this defendant states that it neither affirms or denies the other matters contained in said complaint and therefore leaves the complainant to its strict proof as to such allegations.

"This defendant states that it has just and reasonable rates for the transportation of grain and grain products moving within the confines of the state of North Dakota, and denies that its rates on grain and grain products are in any wise unreasonable or discriminatory in any respect whatsoever.

"Wherefore having fully answered the complaint herein, this defendant as to it asks that said complaint be dismissed."

In accordance with the complaint and petition the board of railroad commissioners gave notice of a time and place for the hearing. At the hearing before the board extraneous parties were permitted to intervene as representatives of commercial interests in the state and of commercial enterprises interested in the subject-matter. A voluminous amount of testimony was taken and thereafter the board of railroad commissioners made its findings and conclusions setting forth the issues presented to it, as follows:

"First, that under chapter 217 of the North Dakota Session Laws of 1925, the North Dakota terminal at Grand Forks is made a public terminal.

"Second, that said chapter 217 vests in the North Dakota railroad commission the authority and duty to fix rates with the view of recognizing such terminal as a public terminal market.

"Third, that the North Dakota terminal is in fact a public terminal market, fully able to function as such, and in fact so functioning as far as able so to do.

"Fourth, that such terminal is the only terminal within the state of North Dakota equipped and able to operate as such, and by law recognized as such.

"Fifth, that the whole rate structure, under which all grain moves to market, as now fastened upon North Dakota, gives no recognition to the North Dakota terminal as a terminal, either interstate or intrastate, and permits no rights of transit except in occasional instances through an arbitrary penalty imposed and practically compels all grain to move without the state, and grants to the terminals without the state full transit rights.

"Sixth, that the North Dakota terminal is entitled to function as a terminal on a basis of equality with other terminals.

"Seventh, that the North Dakota terminal is entitled to rights of free transit upon all grain originating in the territory tributary to it.

"Eighth, that the North Dakota terminal is entitled to joint rates over the lines of two or more carriers with free transit such as will place the North Dakota terminal on a basis of equality with other terminals, and free transit at the North Dakota terminal on the continuous distance rates from origin to ultimate destination.

"Ninth, that the North Dakota terminal is entitled to switching charges on a basis of equality with other terminals."

The decision of the board of railroad commissioners considers the evidence produced by both sides. After summarizing the testimony, the findings and conclusions set forth the provisions of chapter 217 of the Session Laws of 1925. The board then finds that:

"The evidence in these proceedings clearly shows that more grain is handled by the North Dakota terminal than at any other point in the state. The evidence is also conclusive that the terminal is adequately equipped to clean, mix, blend, store or market wheat or other grains on a relatively large scale, and that there are no other mills or elevators in North Dakota which compare with those maintained at Grand Forks. By reason of this fact the terminal is able to render a valuable service to the producers and shippers of grain and grain products.

"The physical terminals of the Great Northern and Northern Pacific

Railways are located at Minneapolis, St. Paul and Duluth, at which points the great bulk of North Dakota's grain crop must naturally move to find an ultimate market. Approximately 95 per cent of the grain moves to points outside of the state, and there is no question but that the North Dakota terminal is at a rate disadvantage in attempting to compete with the large terminals to the east, but this disadvantage is an interstate matter over which this commission has no jurisdiction.

"In the instant case the North Dakota terminal asks that we establish joint line rates no higher than single line rates, with free transit privileges hereinbefore outlined. The testimony and arguments in the terminal case are persuasive, but not conclusive. In Docket No. 1860 this commission established a reduced schedule of grain rates for single and joint line application. The basis prescribed for determining joint line rates is 85% of the combination of locals, this method being agreed to by the state mill and elevator and the carriers. We are of the opinion that upon this record the present basis of making joint rates to and from the North Dakota terminal at Grand Forks is shown to be unreasonable; however, there is no evidence tending to show that the present single line rates are unreasonable. We are further of the opinion that joint line service, is as a rule more expensive than single line service, and that in this case an arbitrary charge should be made to cover such additional expense involved in joint line service.

"As previously shown, the single line scale of rates prescribed by us in Case No. 1860 was for single line application between all points in the state and does not include a charge for accessorial services, such as stopping for cleaning, mill-mixing, blending or storing, performed by the carriers. We are of the opinion that a rate between two points made high enough to include compensation for the service involved in permitting transit operations, is too high for the line haul service of transporting the shipment from origin to destination.

"If a line haul rate is made high enough to permit so-called free transit privileges, the charge for the transit service is paid by all shippers, whether or not they avail themselves of the transit privilege. It is our opinion that the line haul rate itself should cover only the line haul and two terminal services, one at origin and one at destination, and that accessorial services in addition to the line haul should be charged for separately and be paid for by the party receiving the service. To hold

otherwise would, in our opinion, result in placing an undue burden upon other shippers.

"The present switching charge of $6.30 per car from the local elevator to the state mill or elevator is attacked by the North Dakota Terminal as unreasonable and they argue that the charge should not exceed $2.25 per car.    The Great Northern Railway Company answers that this charge is the same as the intra-plant switching charge generally in effect on the Great Northern Railway, with a few exceptions.    There is no evidence in the record tending to show the cost of furnishing this service.    It appears to be a blanket rate covering switching services ranging from those performed in the instant case up to destinations of several miles.    On the record before us, we are of the opinion that a charge of $6.30 per car for switching a distance of some 180 feet to one-half mile is unreasonable in itself, and that the charge should not exceed $4 per car."

On these findings the board concluded, as follows:

"The commission, having carefully considered all of the testimony in these proceedings, the arguments adduced and the representations made and being fully advised in the premises, is of the opinion and finds:

"1. That the North Dakota terminal is by law declared to be a public terminal and public terminal market; that the evidence shows that the terminal is adequately equipped to function, and is functioning, as a terminal in fact in the handling, marketing, cleaning, mill-mixing, blending and storing of wheat and other coarse grains, rendering a valuable service to the producers and shippers of grain and grain products.

"2. That from and after October 1, 1926, joint rates on grain and grain products applicable intrastate between the North Dakota terminal at Grand Forks, North Dakota, and all points on the great Northern, Northern Pacific, and Soo Line Railways in North Dakota, on and north of the main line of the Northern Pacific, Fargo to Beach inclusive, also between all points in the territory just described, when movement is through or via the North Dakota terminal at Grand Forks, will be unreasonable to the extent that they exceed, or may exceed, the single line rates by more than $1\frac{1}{2}$ cents per 100 lbs.

"3. That from and after October 1, 1926, just and reasonable transit

privileges shall include, between all points in the territory last above described, cleaning, mixing, storing or stopping in transit of all grain at the North Dakota terminal at Grand Forks, North Dakota, at a charge of 1 cent per 100 pounds and/or with a further milling in transit privilege at any point between Grand Forks and ultimate destination at a charge of 1½ cents per 100 pounds, in addition to the continuous mileage rate, origin to destination via the North Dakota terminal at Grand Forks, and the second transit station.

"4. That from and after October 1, 1926, the intraplant switching charges on grain and grain products in and within the yards of the State Mill or the North Dakota terminal shall not exceed four dollars ($4.00) per car.

"5. That case No. 2398, the Fargo Case, and case No. 2406, the Bismarck Case, should be dismissed without prejudice to any proceedings which may be had under case No. 2255, now pending.

"An order in accordance with these findings will be entered."

The order made by the board of railroad commissioners, omitting the formal portions, is as follows:

"That from and after October 1, 1926, joint rates on grain and grain products applicable intrastate between the North Dakota terminal at Grand Forks, North Dakota, and all points on the Great Northern, Northern Pacific and Soo Line Railways in North Dakota, on and north of the main line of the Northern Pacific, Fargo to Beach, inclusive, also between all points in the territory just described, when movement is through or via the North Dakota terminal at Grand Forks, will be unreasonable to the extent that they exceed, or may exceed, the single line rates by more than 1½ cents per 100 lbs.

"That from and after October 1, 1926, just and reasonable transit privileges shall include, between all points in the territory last above described, cleaning, mixing, storing or stopping in transit of all grain at the North Dakota terminal at Grand Forks, North Dakota, at a charge of 1 cent per 100 lbs. and/or with a further milling in transit privilege at any point between Grand Forks and ultimate destination at a charge of 1½ cents per 100 pounds, in addition to the continuous mileage rate, origin to destination via the North Dakota terminal at Grand Forks and the second transit station.

"That from and after October 1, 1926, the intraplant switching

charges on grain and grain products in and within the yards of the state mill or the North Dakota terminal shall not exceed four dollars ($4.00) per car.

"It is further ordered that case No. 2398, referred to in the report as the Fargo Case, and case No. 2406, referred to in the report as the Bismarck Case, be and the same are hereby dismissed without prejudice to any proceedings which may be had under case No. 2255, now pending."

From this order the defendants appealed to the district court. On January 20, 1927, the district court affirmed the order and it is from this order of the district court the defendants appeal to this court.

The specifications of error set forth by defendants are as follows:

"1. That the court erred in failing and refusing to find that the order of the North Dakota board of railroad commissioners appealed from went beyond the issues framed by the complaint and answer in requiring that transit be given at the State terminal at Grand Forks at a charge in addition to the line haul rate of 1 cent per cwt.

"2. That the court erred in failing and refusing to find that there is no evidence upon which the same commission could lawfully base its said order requiring that transit be given at the state terminal at Grand Forks at a charge of 1 cent per cwt.

"3. That the court erred in failing and refusing to find that the said commission's findings of fact do not support their conclusion that the carriers be required to give transit at the state terminal at Grand Forks at a charge of 1 cent per cwt.

"4. That the court erred in failing and refusing to find that the said order of the commission results in unlawful discrimination against and a burden upon interstate commerce.

"5. That the court erred in failing and refusing to find that in requiring joint line rates to, from, and through the said state terminal to be made the continuous mileage scale plus 1½ cent per cwt. the commission predicated its action upon a misconstruction of chapter 217, Laws of 1925, relating to public terminal grain elevators.

"6. That the court erred in failing and refusing to find that the portions of the said commission's order appealed from are unlawful, are based on a mistake of law, and, having regard to the interest of

both the public and the carriers, are so arbitrary as to be beyond the exercise of a reasonable discretion and judgment.

"7. The court erred in ordering judgment entered in favor of the complainants and respondents and against the defendants and appellants."

The district court heard the appeal entirely on the record made before the commission and did not see nor hear the witnesses. This was in harmony with the provisions of § 4609c35 of the Supplement which requires the district court to inquire into and determine the lawfulness of the decision or final order of the board of railroad commissioners "on the record of the commissioners as certified to by it." It is apparent therefore the correctness of the order of the district court is to be determined from a review of the testimony taken by the board of railroad commissioners. On appeal from the decision of the district court "the record and testimony and exhibits certified to by the commissioners, and filed in the district court, with a transcript of the proceedings in the district court, shall constitute the record on appeal to the supreme court." The case therefore, is before us on the record made by the board of railroad commissioners and primarily we are required to determine "the lawfulness" of the order appealed from. The "lawfulness" of the order is not confined to the purely procedural parts. The mere fact that the board of railroad commissioners had jurisdiction of the matter does not in itself make its order therein lawful. The term "lawfulness" means more than conformity to legal mechanism. It means, not only did the board have jurisdiction to make and render an order in the matter but that the order it did make was in conformity with the law of the case. This includes the deductions drawn from the testimony and the order based upon these conclusions. It is in this sense that the "lawfulness" of the order is attacked. No question is raised as to the notice given, sufficiency of the time allowed, opportunity to present testimony, or to the character or quality of the hearing; but appellants do say that the order is an unreasonable one in the light of the issues framed and testimony presented, and therefore is an unreasonable order.

The milling transit had been given by the defendants before the filing of the complaint, but not the transit service for cleaning, mixing, storing, etc. This action, therefore, involves the two propositions—

should the board of railroad commissioners require the railroads to give this transit service for cleaning, mixing, etc.; and if so, what charge should the railroads be allowed to make for the service? It is conceded that the public may prescribe conditions under which lawful business affected with a public interest, such as that of common carriers, shall operate; (see Greeley Transp. Co. v. People, 79 Colo. 307, 245 Pac. 720) and the custom and usages of the defendant roads are subject to lawful regulations. See State ex rel. Burr v. Jacksonville Terminal Co. 90 Fla. 721, 106 So. 576. It is not a question of whether the roads will grant the privileges at the terminal; it is matter of service and therefore the railroads are concerned only so far as they are required to render the service, and then only as to the cost of the service required and a reasonable profit therefor; except they cannot be compelled to violate law or lawful regulations.

The question of whether the "state-owned mill and elevator" should be considered a "public terminal grain elevator" is not in issue in this case, though arguments were made as to discrimination against other places of similar business. The evidence shows clearly that independent of the statute this state-owned mill and elevator is in fact a public terminal grain elevator as the term is understood in the grain business. In addition thereto the statute so declares it to be and considers it as such for the agricultural industry of this state. The fact that this "terminal" does not include the whole of the city of Grand Forks is immaterial. A "terminal," in the sense employed, is not so much the city in which it is located, as it is the established facilities within that city which are used for the terminal business. Hence all of these objections to place and locality are not involved in this suit.

The appellants say that "the issues before the commission were framed by the complaint and the answer," and because the complaint asks for free transit privilege for cleaning, mixing, storing and stoppage in transit, therefore the board was limited in its inquiry to whether this transit privilege should be given free, and could not determine what is a reasonable charge for the privilege and require the service; or, as they say in their brief:

"The issue before the commission was whether the transit privilege should be given free or not at all. It was not an issue before the commission as to whether the transit should be given at a charge."

We cannot agree with this view. The issues framed show that the rates charged for transportation are already considered in fixing the charges for such service as is now rendered. The fact that the complainants asked that because of these transportation charges now in force and effect this terminal service be furnished free does not say the board is governed by the prayer. Independent of any complaint the board had the right to institute proceedings itself "to determine and fix the intrastate rates for the transportation of all grain and grain products, moving to or from such public terminal grain elevator within the state of North Dakota." The whole matter was before the board for consideration. It had the right to determine whether such transit service should be given, and if so, what rate should be charged therefor, or whether under existing intrastate transportation rates the service be free, hence there was no error on the part of the board in this respect.

The next point raised by the defendants is "there is no evidence whatsoever in the record upon which the commission could base a finding that 1 cent per cwt. is a reasonable charge for giving transit." We cannot agree with this view of the record. The record shows that this terminal has now in operation four miles of trackage, costing $73,000 paid for and maintained by the state of North Dakota and used by the defendants free of charge. It is clear, so far as this trackage is concerned, there is no cost to the defendants and therefore this can be taken into consideration in determining the reasonable charge for the service. Again the evidence shows that the facilities for handling grain at this public terminal now, when you consider the size of the city, the amount of general traffic, the congestion or lack of congestion and all other features considered in determining cost, are superior to those in many other terminals where the railroads charge only 1½ cents for this transit service; that the roads can handle more cars in less time, at less cost, for less distance and with less time for inspection, that 75 per cent of the cars at the terminal are unloaded, etc., in forty-eight hours as compared with seven days at Minneapolis and four or five days at Duluth and that the roads grant this transit service now in interstate traffic for 1½ cent. The evidence further shows that the defendants now charge but 1½ cent for milling transit having charged

2½ cents previously, and that the time required for such service is greater than for transit service in cleaning, storing and mixing grains.

The undisputed testimony shows that for some time prior to the commencement of this action there has been a terminal grain exchange operated at Grand Forks handling about 2½ million bushels of wheat in the same manner and for the same purpose as at Minneapolis, and that this terminal could handle 25 million bushels of wheat in a season; that it is the "natural diverting place" for other markets such as Duluth or Minneapolis and that it "is a common every-day experience" for shippers, after cleaning and testing, to ship cars to either of those markets or to sell locally; that most of the cars of wheat originating in North Dakota and destined for Minneapolis or Duluth and passing through Grand Forks are stopped there for Federal inspection; that this terminal can to-day make every kind of mill mix "as close as anybody in the world;" that the capacity of the state mill is 18,000 bushels of wheat per day and the terminal can unload nine cars per hour, can load twelve cars per hour, can clean 6,000 bushels per hour, can mill mix 1,200 bushels per hour and can dry 2,000 bushels per hour "to the extent of about 2 or 3 per cent of the moisture;" that the switching charges are $6.30 per car as compared to $2.25 at other terminals for greater distances; that 68 million bushels of wheat of the 1925 crop out of a total production of 113 million in North Dakota "was produced in territory claimed to be tributary to this terminal." The complainants also furnished proof to the effect that the Twin City terminals are expensive and their switching operations more expensive than at Grand Forks. On the part of the defendants it was shown that cleaning and storing in transit of grain originating in North Dakota was permitted at Grand Forks at a charge of 1½ cent per cwt. when the grain was destined to eastward terminals; that this charge had been 2½ cents but was reduced to 1½ cent; that though service is identical in quality at different points there may be differences in the expense of rendering the service at these different points; that there is more expense for cleaning in transit at Grand Forks than for a straight shipping car though the service be the same; that the switching charge at Grand Forks in connection with the line haul service is $3.80 but a car switched to the terminal elevator has forty-eight hours free time for which the road has to pay other roads $1 per day for the use of

their cars, and $1 per day does not pay for the use of its own idle car. The defendants also furnish proof that the single line wheat scale in North Dakota "is considerably lower than our interstate wheat scale." On the part of the complainants testimony was introduced showing that for certain service and distances in Minnesota the railroad charge was 22½ cents whereas in North Dakota it would be 26½ cents for the same service and distance even if complainants' request were granted. All these are factors to be taken into consideration in determining whether the rate allowed is a reasonable one, and are shown by the record.   Consequently this second error complained of is untenable. Further it may be stated that the board fixed switching charges at $4 a car in addition and evidently this charge is satisfactory to the defendants as they did not appeal therefrom.

The third error complained of in the brief is that the rate fixed is not a "reasonable transit charge." It must be observed that the "lawfulness" of the order made by the board in this respect must be determined from the evidence introduced, and while a fair and impartial consideration of such evidence may lead to differences of opinion as to the reasonableness of the rate fixed, and while this court "must exercise its own independent judgment upon such facts and the law applicable thereto" yet this court will give "whatever weight to which they may be entitled, if any, to the findings of the Commission upon disputed questions of fact, the determination of which involves the credibility of witnesses who testified orally before the commission." See State ex rel. Hughes v. Milhollan, 50 N. D. 184, 201, 195 N. W. 292.   This does not mean this court will necessarily substitute its opinion for the opinion of the Board, if the opinion and determination of the board on the testimony given orally is a reasonable one, even though some other reasonable conclusions could have been deduced from the same set of facts.   While we exercise our own independent judgment, this judgment must necessarily be influenced to some extent by the judgment of the board, in a matter primarily before it and of which it has such special facilities for judging of which we are denied.

We have already alluded to some factors which are taken into consideration in determining what is the reasonable rate.   There is another fact which the board considered and it must not be overlooked. "The record discloses that the time this case was heard before the

commission, the North Dakota terminal had free transit on Montana grain destined to Minneapolis or beyond; and, also free transit on North Dakota grain destined to Chicago or Chicago rate points. The record also discloses that for purposes of inspecting grain on the in-spection tracks of appellants in their yards or in the switching yards owned by the state the switching movement of setting out the cars or moving the cars to the North Dakota terminal is done without charge and is included as a part of the rate now charged." This transit charge is for service rendered after the shipment of grain has reached Grand Forks and over terminal facilities—not expensive ones maintained by the carriers like the ones at Duluth or Minneapolis. The transporta-tion rates in force and effect in the State of North Dakota must be con-sidered. It is the claim of the complainants that transportation rates in North Dakota are greater than the rates charged for the same service in Minnesota. Complainants say that "the single line class rates for North Dakota are high," that the record also shows that this class of transit service furnished at such terminals as Minneapolis and Duluth is free, for at Minneapolis a car of wheat "can be cleaned, mixed, stored or milled there without any transit penalty of any kind being assessed." Of course we must consider the factor that the roads may be said to terminate there and being at a connecting point need not care just where the car is stopped. Nevertheless, the element of delay, and consequent loss of service of the car must be considered. All this service rendered therein has been taken into consideration in fixing the transportation rates, and even thereafter the transportation rate is less than in North Dakota. The complainants say:

"Indeed the findings of the commission concerning the reasonable-ness of 1 cent are amply sustained. In our opinion further this com-mission might well have found that for such service based on the exist-ing single line rates, the transit should be free just the same as it is free at Minneapolis or Duluth."

Defendants in their brief say the "single line rate is not attacked by the complainants in this proceeding." This rate is 18½ cents per cwt. from Minot to Grand Forks, and 22½ cents per cwt. from Minot to Fargo. The rate where the shipment "involves a joint line haul" is 85 per cent of the sum of the "single line rates to and from interchange point." These are the rates which are established and in force, and

which the board took into consideration in determining what rate it would set as a reasonable fee for the transit service to be furnished at the terminal. The record shows that the rates in Minnesota are less, with free transit service at the terminals in Minnesota. It is true many factors must be considered in determining whether the transportation rates in effect now are sufficient to justify a transit service of 1 cent instead of 1½ cent. The amount of business transacted, sparceness of population, difficulties of transportation and all such elements must be considered; but we must assume that the rates now established are fair. The amount to be charged for transportation service may vary with changing time and conditions and the board could well believe the rates charged now are sufficiently high so that it would be better to leave them as they are and have a lower transit fee, rather than to undertake to lower the transportation rates and maintain the present transit fee.

Another factor to be taken into consideration is that to-day the defendants charge only 1½ cent for a milling transit service when such service takes more time than service in cleaning, storing and mixing grains. If the rate of 1½ cent voluntarily made by the defendants for milling transit service be a fair and reasonable charge, and we have no reason to believe they are charging less than a reasonable rate, then the board is justified in believing from the evidence that a 1 cent charge for the transit service desired is a reasonable rate. We cannot say the Board erred in this respect.

The next point raised by the defendants is that "the order requiring the transit at 1 cent per cwt. is unlawful in that it results in an unlawful discrimination against interstate commerce." It is true that if the shipments originate in the state and terminate in Minnesota, so they are interstate shipments the transit fee fixed by the interstate commerce commission controls whereas "if the shipments originate in and terminate in this state and move through the Grand Forks terminal so that a transit service is required the rate fixed by the board of railroad commissioners for this intrastate shipment would be lower; but before it can be said that the rate "is a discrimination against interstate commerce" the evidence must clearly and distinctly point it out. Defendants point to the action of the Interstate Commerce Commission in ordering the increase in North Dakota on intrastate rates on coal

to correspond with increases made in the interstate rates as shown by the case of North Dakota. Fares & Charges, 61 Inters. Com. Rep. 504. It must be remembered however, that this is dealing with transportation rates. The one at issue is dealing with an incidental service on a rate now concededly higher than the rate charged for the same service in Minnesota. Because rates may differ in amount does not say it is a discrimination against interstate commerce. "Discrimination" is a net result of all the factors under consideration. Even if the Interstate Commerce Commission should fix a transit fee of $1\frac{1}{2}$ cent per cwt. for cleaning and transit privileges at the terminal on shipments from east of Grand Forks it would not necessarily mean that the rate fixed by the North Dakota board is discriminatory for there are factors incident to shipments from the east which are not present in state shipments from west of Grand Forks. Hence we do not consider the fee fixed by the board is a discrimination against interstate commerce, any more than lowering intrastate transportation rates if they should be lowered. At times all such rates must be subject to re-adjustment.

The last point raised by the appellants is to the effect that the "requirement of the order that joint line rates to, from and through the state terminal be made the single line rates plus $1\frac{1}{2}$ cent per cwt. is unlawful," in this that there would be unjust discrimination against other milling companies in Grand Forks, that these other milling companies "would have to pay a higher joint rate than the state mill for a shipment of grain or flour moving between identically the same points." This specification overlooks several factors. The evidence shows that not only the state mill but other mills in Grand Forks have to pay transit for milling service. It is not the state mill which is the terminal—it is everything connected therewith at Grand Forks. When we speak of Duluth or Minneapolis as being terminals we do not understand, that it is every street and alley and portion of the city; but that portion where the facilities, the equipment, the mills and elevators are, without requiring them to be congregated in any special section. There is nothing to indicate that other mills in Grand Forks cannot avail themselves of the same privileges and service or that they would be shut out under this order. No such mill and elevator is complaining nor is there any indication that what is reasonable for this terminal is unreasonable for any other mill or elevator in the city. The method

used by the board in computing the rates, which appellants say is unlawful discrimination against other shippers, is the method used by the Interstate Commerce Commission itself on other commodities.

The appellants cite many cases to illustrate the law which the defendants say controls this case. For example, the case of State v. Great Northern R. Co. 130 Minn. 57, P.U.R.1915D, 467, 153 N. W. 247, Ann. Cas. 1917B, 1201, to show that the order of the board should be vacated as unreasonable:

"The order may be vacated as unreasonable if it is contrary to some provision of the Federal or state Constitution or laws, or if it is beyond the power granted to the commission, or if it is based on some mistake of law, or if there is no evidence to support it, or if, having regard to the interest of both the public and the carrier, it is so arbitrary as to be beyond the exercise of a reasonable discretion and judgment."

And to the same effect the case of United States v. Abilene & S. R. Co. 265 U. S. 274, 68 L. ed. 1016, 44 Sup. Ct. Rep. 565, to the effect that "a finding without evidence is beyond the power of the commission" and the case of Interstate Commerce Commission v. Union P. R. Co. 222 U. S. 541, 56 L. ed. 308, 32 Sup. Ct. Rep. 108, to show that the board's order can not be supported by "a mere scintilla of proof." The case of Southern R. Co. v. St. Louis Hay & Grain Co. 214 U. S. 298, 53 L. ed. 1004, 29 Sup. Ct. Rep. 678, is cited to show that:

"A railway carrier is entitled to some compensation in addition to the actual costs involved in taking, loaded cars in transit to the shipper's warehouses—for unloading, inspection and reloading, etc."

Many other cases are cited as authority for various positions taken by defendants. This case is not so much a matter of construction of law as it is a question of fact. It is conceded that the board has the general jurisdiction to fix a reasonable transit fee for the service demanded; therefore it became a question of whether the rate fixed by the board is a reasonable one under the testimony introduced, and for the determination of this we consider the lawfulness of the order made. As said by the supreme court of South Dakota in the case of Chicago, M. & St. P. R. Co. v. Railroad Comrs. 47 S. D. 395, 199 N. W. 453, stoppage in transit is a right enumerated in the Interstate Commerce Commission Act as a service to which the shippers are entitled and is not a mere privilege and the state railroad commission is em-

powered to make an order requiring railroad companies to establish such a right. This is conceded by the defendants in principle; but denied as in issue herein. If the board may determine a rate in this case, then the whole issue is one of fact. The complainants ask for two matters of relief. They say, the state mill and elevator at Grand Forks with its facilities and equipment is in fact and by law a public terminal and ask the board,—first, require the defendant to grant stoppage in transit for cleaning, mixing, etc., of grain; and second, under existing transportation rates require this service free, or fix a reasonable rate therefor. The defendants have no right to complain if they get an adequate return for the service rendered. The board of railroad commissioners of course, gave careful attention to the whole matter and determined that this rate fixed is an adequate one. It does not appear to be satisfactory to the defendants but we are not prepared to say the defendants have shown it to be inadequate when all factors are taken into consideration.

The judgment of the lower court is affirmed.

NUESSLE, Ch. J., and BURKE, BIRDZELL, and CHRISTIANSON, JJ., concur.