# INTERSTATE COMMERCE COMMISSION *v.* UNION PACIFIC RAILROAD COMPANY.

## SAME *v.* NORTHERN PACIFIC RAILWAY COMPANY.

## SAME *v.* GREAT NORTHERN RAILWAY COMPANY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

Nos. 451, 452, 453. Argued October 18, 19, 1911.—Decided January 9, 1912.

The Act to Regulate Commerce makes the findings of the Interstate Commerce Commission as to reasonableness of a rate *prima facie* correct. *Cincinnati &c. Ry.* v. *Interstate Commerce Commission,* 206 U. S. 154.

Orders of the Interstate Commerce Commission are final unless beyond the power that the Commission can constitutionally exercise; beyond its statutory power, or based upon a mistake of law.

An order of the Commission, regular on its face, may be set aside if it appears that the rate is so low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law; or if the Commission acted so arbitrarily and unjustly as to fix rates contrary to evidence or without evidence to support its conclusions; or if the authority was exercised in an absolutely unreasonable manner.

This court, in determining the validity of an order of the Interstate Commerce Commission, confines itself to the ultimate question as to whether the Commission acted within its power. It will not consider expediency, nor will it consider facts further than to determine whether there was sufficient evidence to support the order.

Where, as in this case, there is testimony as to value of the roads, amounts expended, dividends, ratio of earnings and expenses, and other matters, there is evidence to support the conclusions and the findings of the Commission on such facts are conclusive.

Reasonableness of railroad rates cannot be proved by categorical answers like those given in regard to value of articles of merchandise; too many elements are involved which require consideration.

*Quære:* whether the maintenance of an admittedly low rate for a long time raises a presumption of reasonableness because the carriers realized a profit thereon.

An order of the Interstate Commerce Commission is not to be considered by itself alone, but must be considered in the light of. all the testimony, and when carriers themselves maintain a ratio of difference, a rate fixed by the Commission maintaining the same ratio of difference cannot be said to be beyond its power.

An order of the Interstate Commerce Commission within its power cannot be held invalid because it appears that possibly the Commission considered other subjects than the reasonableness of the rate; and in this case, *held* that an order fixing a rate on lumber was not invalid because the Commission examined into the effect of the rate on the lumber business and on the industries of the various points affected.

THESE three appeals are brought by the Interstate Commerce Commission from a decree enjoining a reduction of lumber rates named in tariffs filed by the Great Northern, the Northern Pacific and the Union Pacific Railroads.

The tariffs under consideration involve rates on lumber from the coast, Spokane District, and Montana-Oregon points to St. Paul, Omaha and Chicago. It is admitted that the rates on shingles, hemlock, cedar and other forest products have a fixed relation to those on fir lumber, and that the differentials from Spokane and the Montana-Oregon territory have a like fixed relation to those from the coast.

The summary of these very lengthy records will therefore be limited to a statement of those facts bearing directly on the pivotal question as to the validity of the order fixing a rate of forty-five cents per hundred pounds on fir lumber from the coast to St. Paul.

In 1893 the rate, from the coast, on fir lumber, over the two northern lines to St. Paul, was fixed at 40 cents, and since 1901 the rate to Omaha at 50 cents.

In 1907 the three carriers concurrently filed new tariffs, making the rate from the coast to St. Paul 60 cents, to Omaha 55 cents and to Chicago 60 cents. Thereupon

various corporations filed complaints before the Commission, alleging that the proposed rates were unreasonable and would seriously affect the lumber industry. The carriers emphatically denied both of these allegations and, in explanation of the causes leading up to the advance, showed that when the Great Northern was completed to the coast, about 1893, almost all of the freight shipped over its line went from the east to the west—cars being hauled back empty to St. Paul, its eastern terminus. In order to correct this expensive and unremunerative situation, the Great Northern decided to put in a rate on lumber so low that mill men on the Pacific coast might compete with dealers in white and yellow pine, in the Chicago market, 2,500 miles distant. It thereupon reduced the existing rate to 40 cents. That cut was met by the Northern Pacific which also reached St. Paul, but the Union Pacific at that time made no change in its rate. The reduction opened up new markets, and was soon followed by heavy shipments of lumber to the east. The business grew steadily, and prior to the filing of the tariffs in 1907, the empty car movement had been completely reversed—many cars being hauled empty from St. Paul to the coast and returning to the east loaded with lumber.

Traffic increased to such an extent that it became necessary to open up new tunnels, construct additional passing tracks and reduce grades and curves. There was a constant increase in gross earnings, but the carriers contended that there had been such an enormous and disproportionate increase in the cost of operation, that it was absolutely necessary to discontinue the unremunerative 40 cent rate and advance it to 50 cents, which they insisted was just and reasonable.

There was no finding as to the effect on gross earnings which would result from the proposed advance of ten cents. But, as the Great Northern, in one year, hauled 1,765,095,997 tons one mile, equivalent to about 30,000

cars, of the average load of 58,000 pounds, transported 2,000 miles from the coast to St. Paul, the advance of ten cents per hundred, or $58 per car, would represent a gross annual increase, for that company alone, of $1,740,000.

An immense amount of evidence was offered by both parties in support of their respective contentions. The Commission rendered an elaborate opinion (14 I. C. C. 1), and concluded by finding that the old rates were just and reasonable and should be restored to all points on and west of the Pembina line, which ran from the Canadian line almost due south through Fargo, Omaha, to Port Arthur, Texas. As Omaha was on this line, the effect of that part of the order was to prohibit the 55 cent advance, and to restore the old rate of 50 cents to Omaha, which had been in force since 1901. As to rates east of the Pembina line the Commission held that "they might reasonably be somewhat increased, but not more than five cents per hundred, to be graded up so as to reach the maximum increase at . . . St. Paul; . . . the rate from the Missouri river crossings should be graded up, the maximum increase of five cents reached at the Mississippi river. Chicago rates should apply to all points between the Mississippi . . . and Chicago."

The carriers thereupon filed separate bills to enjoin this order, and repeated therein the contentions made before the Commission; averred that the old 40 cent rate to St. Paul and the 50 cent rate to Omaha were not only unremunerative, but proportionately so much lower than rates on other merchandise as to amount to an unjust discrimination; alleged that the prosperous condition of the lumber business did not require or justify a further maintenance of this low rate; and, among other things, insisted (1) that the order was beyond the power of the Commission, because entered without any evidence, or finding, that the rates fixed by the carriers were unjust or unreasonable; and (2) was void because the Commission

erroneously held, as a matter of law, that the long continuance of the old rate, during a period when the carriers' total income was sufficient to pay dividends, raised the presumption that the old rates were reasonable.

The Commission demurred and, in its answer, averred that evidence was introduced showing, and tending to show, that the advanced rates were unreasonable; and that, after a full hearing, it was of opinion that the rates complained of were unreasonable, and entered its order accordingly; that the determination of that question involved the exercise of a discretion committed solely to the Commission, and that the "courts ought not and could not review its judgment, and finding, unless it be made clearly to appear that the orders complained of transcend the pale of legitimate regulation."

The cases were referred to a Master, who reported that the allegations of discrimination were not only too general, but that there was no evidence upon which any ruling could be predicated on that subject; that the substance of the bill was that the rates put in by the Commission were confiscatory, and, as to that, held that the evidence was not sufficient to warrant the court in setting aside so much of the order as restored the rates to, and west of, the Pembina line. There was some evidence that the cost of hauling freight over the Union Pacific was greater than over the northern lines, because it crossed the mountains at a point 2,000 feet higher than they did. But the Master found, as a fact, that the traffic conditions were substantially the same over the three roads, and that the distance from the coast to Omaha was 1,800 miles and to St. Paul 2,052 miles. He thereupon held, as a matter of law, that when the Commission fixed 50 cents as a reasonable rate to Omaha over the shorter route, it necessarily followed that the lower rate of 45 cents, over the longer route to St. Paul, was not only unreasonable but unjust.

And even "though the rate might not be confiscatory,

yet an order which, on its face, is inherently inconsistent' with the fundamental principles of rational justice, and perverts the spirit and intent of the Interstate Commerce' Act, though in form within the limits of delegated power,' is, in fact, beyond those limits and is an unlawful order,' and one which results in the taking of property without due process of law." He recommended that the court should enjoin so much of the order as permitted an advance of only five cents to points east of that line.

The Commission, and each of the carriers, filed many exceptions to the report, as to which the Circuit Court passed the following order: "All the exceptions to the report of the Master must be overruled. Those which challenge his finding that the reduction, by the Interstate Commerce Commission, of the 50 cent rate on lumber to St. Paul and other points east of the Pembina line, was arbitrary, and so palpably unjust and unreasonable, and so discriminatory that it was beyond the power of the Commission, are overruled; on the ground that this action of the Commission was beyond its power, or so palpably and gravely unjust and unreasonable as to be beyond the substance, if not beyond the form, of its power." -

*Mr. Luther M. Walter* and *Mr. Jesse C. Adkins* for appellant.

*Mr. Hale Holden,* with whom *Mr. Charles Donnelly* and *Mr. F. C. Dillard* were on the brief, for appellees.

MR. JUSTICE LAMAR, after making the foregoing statement, delivered the opinion of the court.

These appeals raise the single question as to whether, in making the 45 cent rate, the Commission acted within or beyond its power. As the statute makes its finding *prima facie* correct (*Cincinnati &c. Ry.* v. *Interstate Commerce Commission,* 206 U. S. 142, 154), it will be more con-

venient to consider the case from the standpoint of the carriers, who first insist that the order was void because made without evidence, or finding, that the 50 cent rate was unreasonable.

'There has been no attempt to make an exhaustive state-ment of the principle involved, but in cases thus far de-cided, it has been settled that the orders of the Commission are final unless (1) beyond the power which it could consti-tutionally exercise; or (2) beyond its statutory power; or (3) based upon a mistake of law. But questions of fact may be involved in the determination of questions of law, so that an order, regular on its face, may be set aside if it appears that (4) the rate is so low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law; or (5) if the Commission acted so arbitrarily and unjustly as to fix rates contrary to evidence, or without evidence to support it; or (6) if the authority therein involved has been exer-cised in such an unreasonable manner as to cause it to be within the elementary rule that the substance, and not the shadow, determines the validity of the exercise of the power. *Int. Com. Com.* v. *Ill. Cent.*, 215 U. S. 452, 470; *Southern Pacific* v. *Int. Com. Com.*, 219 U. S. 433; *Int. Com. Com.* v. *Northern Pacific*, 216 U. S. 538, 544; *Int. Com. Com.* v. *Alabama Midland Ry. Co.*, 168 U. S. 144, 174.

In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the Commission acted within its power. It will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. "The findings of the Commission are made by law *prima facie* true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience." *Ill. Cent.* v. *I. C. C.*, 206 U. S. 441. Its conclusion, of course, is subject to re-view, but when supported by evidence is accepted as final;

not that its decision, involving as it does so many and such vast public interests, can be supported by a mere scintilla of proof—but the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order.

2. We proceed, then, to a consideration of the carriers' contention that the order was void because made without any testimony that the 50 cent rate of 1907, to St. Paul, was unreasonable. We find that, as far back as 1893, the rate on fir lumber was reduced to 40 cents, on the theory that after a carrier had been paid for transporting a carload of freight from the east to the west, it was better to haul it back loaded with lumber at 40 cents, thereby earning something, than to take it back empty and get nothing. But if, after the empty car movement had been reversed, the carrier had to be at the expense of hauling cars empty to the west for the purpose of returning them loaded with lumber at the unremunerative rate of 40 cents, there would be a double loss—it got nothing for hauling the empty car from St. Paul to the coast, and it derived no profit for hauling it back at the low rate. They contend that this situation, in connection with the enormous increase in the cost of operation, not only justified but required an advance over the 40 cent rate. And this view of the testimony seems to have been taken by the two commissioners who dissented. If there was no other evidence, the Commission's order could not be sustained.

But these facts do not stand alone. In the first place there was no appeal from the Master's finding that:

"The carriers concede that they are unable to determine the cost of this traffic, in and of itself; and that they are unable to say, with any satisfactory accuracy whether or not they make a profit upon it; but they have all conceded that, in their judgment, speaking as experts, the lumber traffic has not been confiscatory and has not been performed for less than cost."

This concession, of course, does not cover the question at issue, but it does fix a starting point. It establishes an important fact in dealing with the difficult question of determining what is a reasonable rate on a particular article. Where the rates as a whole are under consideration, there is a possibility of deciding, with more or less certainty, whether the total earnings afford a reasonable return. But whether the carrier earned dividends or not sheds little light on the question as to whether the rate on a particular article is reasonable. For, if the carrier's total income enables it to declare a dividend, that would not justify an order requiring it to haul one class of goods for nothing, or for less than a reasonable rate. On the other hand, if the carrier earned no dividend, it would not have warranted an order fixing an unreasonably high rate on such article. But the absence of direct testimony that the 50 cent rate was unreasonably high is unimportant. Neither can any specific effect be given to the statement of witnesses that the 40 cent rate was low. The reasonableness of rates cannot be proved by categorical answers, like those given, where a witness may, in terms, testify that the goods were worth so much per pound, or the services worth so much a day. Too many elements are involved in fixing a rate on a particular article, over a particular road, to warrant reliance on such method of proof. The matter has to be determined by a consideration of many facts.

In this case the Commission had before it many witnesses and volumes of reports, statistics and estimates, including the rates on lumber charged by other roads, and those charged by these carriers on other classes of freight. There was evidence that during the fourteen years, when the 40 cent rate was in force, the carriers had, by proper management and without wasteful economies, kept their properties in a high state of efficiency, and after paying all the costs of operation, maintenance, depreciation, fixed

charges and sinking funds, had been able to pay reasonable dividends.

There was evidence as to the value of the road, the amounts expended in betterments and paid out in dividends, ratio between the increased earnings and increased expenses, with many tables and estimates tending to show the cost of hauling empty cars, fully loaded cars, and those carrying an average load.

With that sort of evidence before them, rate experts of acknowledged ability and fairness, and each acting independently of the other, may not have reached identically the same conclusion. We do not know whether the results would have been approximately the same. For there is no possibility of solving the question as though it were a mathematical problem to which there could only be one correct answer. Still there was in this mass of facts that out of which experts could have named a rate. The law makes the Commission's finding on such facts conclusive. There was then, under the statute, nothing for the companies to do except to comply with the order—or, act on the suggestion thrown out in the Commission's answer, and apply for a rehearing, in reliance upon its power and duty to modify its order if the new evidence warranted such change.

3. When the bills were filed the carriers insisted that the order was the result of a mistake of law, in that the Commission held that the long maintenance of the 40 cent rate raised a presumption that it was reasonable, because the carriers had been earning a reasonable profit. But we need not consider whether, under such circumstances, the maintenance of the admittedly low rate raised any presumption of reasonableness; or, if so, whether it is not neutralized by the presumption of right conduct by the carrier as primary ratemaker (*Interstate Com. Com.* v. *Chicago &c.*, 209 U. S. 108, 119). For whatever influenced the Commission in restoring the rates to the Pembina line

—as to which there is now no appeal—it is evident that as to points east of that line they did not act on any presumption that the old 40 cent rate was reasonable. On the contrary, they acted directly contrary to any such presumption, and instead of maintaining the old rate, allowed a new and higher rate to St. Paul, permitting an advance of five cents per hundred, or 12½ per cent, or between $500,000 and $1,000,000 per annum, to the Great Northern road alone.

4. And this brings us to a consideration of the Master's finding, approved by the Circuit Court, that in fixing a rate of 45 cents to St. Paul, the order on its face was void because, with traffic conditions over the three roads practically the same, the Commission allowed the high rate of 50 cents to the short route and the low rate of 45 cents to the long route. It was argued that when the Commission had adjudged that a rate of 50 cents for 1,800 miles was reasonable, it was manifestly unreasonable to allow a rate of 45 cents for 2,052 miles, and that such order was so palpably unjust and unreasonable as to be beyond the substance, if not beyond the form, of the Commission's power.

It does not follow, as a matter of law, that rates should be the same for the same distance over two different roads, and this would be especially true if the cost of transportation was greater over the Union Pacific than over the Northern lines because it crossed the mountains 2,000 feet higher than they.

But, with the Master's finding that traffic conditions were practically the same, it might be that the order would appear unreasonable on its face, if it fixed the high rate over the short route and the low rate, with less revenue, per ton, per mile, over the long route. But the order cannot be considered by itself alone. It must be read in the light of the entire record, including the important fact that the carriers themselves, in making their rates, made a similar difference between the long and the short line.

By their own tariffs they clearly show that they did not
consider mere distance a controlling factor in fixing the
rates now under attack. And this is not exceptional, for
it appears that they make rates from basing points to
common points, with the result that two cars of lumber,
of the same weight, may be shipped from the same place,
over the same line, at the same rate to different points,
although the distance one car is hauled may be several
hundred miles greater than the other.

But the fact that the carriers themselves, in 1893, 1901
and 1907, charged more to Omaha than to St. Paul is a
much weightier fact in considering this attack on the or-
der. In making the difference between these two cities
the Commission only did what the carriers themselves had
done, under their old and new rates. After 1901, the rate
to Omaha was 50 cents and the rate to St. Paul, over the
longer route was 40 cents. In the 1907 tariff, now under
consideration, the rate to Omaha, over the short route,
was fixed by them at 55 cents; and that to St. Paul, for
the longer route, was fixed at 50 cents. This was a differ-
ence of 5 cents in favor of the short route. The Com-
mission made the same difference in favor of the same
road.

This difference is supported by what the record shows
as to rates to points on the Pembina line. Inasmuch as no
appeal was taken from the refusal to enjoin their resto-
ration, we may assume that all parties admit these rates to
be reasonable. But there was a difference as to rates to
points on this line which shows that the per mile ratio can-
not be regarded as a necessary standard. For example,
the rate to Omaha, on the lower part of this line was 50
cents, while the rate to points on the northern end was 40
cents. This was a difference of 20 per cent in favor of
Omaha, although there was no such difference in the dis-
tance. Again, timber shipped from the coast to St. Paul,
passed through this 40 cent point on the northern end of

the Pembina line.   The distance from the coast to St. Paul was one-eighth greater, and the advance allowed was one-eighth, or five cents over the 40 cent rate.

It is quite true that the carriers may do what they could not be compelled to do.   But it is not to be assumed that they made and continued these different rates between these two cities arbitrarily and without reason.   It was proper for the Commission to consider the weight and the character of these reasons and the causes which prompted and justified the carriers in charging these different rates. When the Commission maintained the same ratio of difference as that made by the carriers themselves, it cannot be fairly said that such an order was so arbitrary as to be palpably and gravely unjust, and beyond the substance, if not the form, of its power.

5. A final point remains to be considered, although it involves an issue not presented by the pleadings, not included in the Master's report and not passed on by the Circuit Court.   It is, however, argued that on this appeal the record may be searched and the decree affirmed because, in making its order, the Commission was influenced solely by a consideration of the effect of the advance in rates on the lumber industry.

It does appear that the lumber men, in their complaints before the Commission, alleged that the advanced rates were unreasonable; and, apparently on the theory that the injurious effect on their business would sustain that contention, they alleged that the new rate would destroy the lumber industry.   Issue seems to have been joined on both propositions, and there were mutual criminations and recriminations of prosperity—the lumber men insisting that the railroads had made large profits under the old rate, and did not need the advance, which would destroy the ability of the lumber men to ship lumber to the east.

The carriers, on the other hand, contended that the 40 cent rate had opened up new markets and developed the

lumber business to a point where it had become enormously profitable, and would continue so under the advanced rates, because white pine had practically disappeared from the market, and that the increased price of lumber more than made up for the increased cost of timber and labor.

It is true, also, that the Commission examined into the effect of the old and the new rate on carrier and lumber men alike. But we do not find that it made the order because of the effect on the lumber industry. In the *Willamette Case* (219 U. S. 445), counsel for the mill men admitted that the rate there under attack was reasonable in and of itself, but insisted that statements of officers and action of the carrier operated to estop the road from raising a low rate up to a reasonable rate.

Nothing of the sort is found here. The rates were attacked as unreasonable, and, on evidence already referred to, the Commission found that the old rates to the Pembina line were reasonable and could not be changed, but that there might be a reasonable increase to points east of that line, not to exceed five cents.

While there is language in the opinion which, looked at alone, might suggest that the Commission was attempting to decide more than the single question as to what was a reasonable rate, yet, taking the opinion as a whole, it affirmatively appears that the Commission confined itself to the exercise of its statutory powers to fix rates. In its opinion it did discuss the issue of prosperity presented by mill men and carriers alike, but held (p. 14) that—

" . . . This controversy cannot be determined wholly upon the ground that complainants have enjoyed the lower rate for many years and that interests have been built up thereunder, and that loss of business investments, profits and markets will result under the increased rates. It must be determined on the justness or reasonableness of the rates in controversy. . . . If the old

rates were too low to be just and reasonable, complainants [mill men] cannot urge their loss as a ground for maintaining them; if the old rates were just and reasonable, the defendants cannot justify the advance on the ground of the prosperity of the lumber business."

Considering the case as a whole, we cannot say that the order was made because of the effect of the advance on the lumber industry; nor because of a mistake of law as to presumptions arising from the long continuance of the low rate, when the carrier was earning dividends; nor that there was no evidence to support the finding. If so, the Commission acted within its power and, in view of the statute, its lawful orders cannot be enjoined. The decree, therefore, must be

*Reversed.*