Prior to the enactment of Chapter 13700, Laws of 1929, any person or persons who saw fit could operate indiscriminately, at will, and without any regulation whatever, so far as statute law was concerned, automobiles, busses and trucks for hire over the highways of this State. Railroad common carriers, who owned, constructed and maintained their own roadbeds and rights of way and paid taxes thereon, had long been under strict regulation and control. The numerous motor vehicle common carriers, which used the road beds and pavements constructed and maintained by the public, were free from regulation or control. The right of a citizen to travel upon the highway and to transport his property in the ordinary course of life and business differs radically from the use of the public highway to conduct a private business for profit. There can be no doubt that the latter is not an inherent right. It is rather in the nature of a privilege or permission which can be granted or withheld by the State, or, when permitted, can be subjected to regulation and control by the State. The operation of such motor vehicle carriers for profit on the public highways is a special use of them which tends to obstruct and impede ordinary traffic and requires additional construction, maintenance and repairs of the highways at the expense of the public. This condition of affairs furnishes additional reasons for their regulation and control. 42 C. J. 675; Pond on Public Utilities, 3rd Ed., Sec. 806; Cahoon v. Smith, 128 So. R. 632; State ex rel. v. York, 106 So. R. 418, 90 Fla. 625. The power of the State to exercise such regulation and control in the interest of the general public cannot be successfully controverted. 42 C. J. 641.
The legislature of 1929 evidently concluded that the conditions which had arisen in this State under the oldlaissez faire policy, or lack of policy, toward such use of the public *Page 1036 
highways demanded a remedy, and the remedy which was adopted was the quite comprehensive statute above referred to. The general policy underlying this statute appears to be largely based upon the following considerations: that there should be a central regulating body having jurisdiction to regulate such transportation in the public interest and in accordance with the provisions of the statute, such body having the right (except as to lines already being operated on April 19, 1929) to grant certificates to such motor transportation companies as are reliable and financially responsible; to impose taxes and reasonable terms and conditions upon such companies as to their methods of operation; to protect the highways from needless and unnecessary use; to prevent ruinous competition, and to only grant certificates for the operation of those motor bus and truck lines whose operation is requisite to the publicConvenience and necessity. And the statute quite appropriately prescribed that such regulatory body should be the same Commission which had for many years been entrusted with such a large measure of regulation and control over the railroad common carriers of this State. The fact that the statute so provided is not without significance in construing the meaning and scope of the statute.
Mr. Pond in his work on Public Utilities, 3rd ed., Sec. 775, says:
 "The prime object and real purpose of commission control is to secure adequate sustained service for the public at the least possible cost, and to protect and conserve investments already made for this purpose. Experience has demonstrated beyond any question that competition among natural monopolies is wasteful economically and results finally in insufficient and unsatisfactory service and extravagant rates. Neither the number of the individuals demanding other service *Page 1037 
nor the question of fares constitutes the entire question, but rather what the proper agency should be to furnish the best service to the public generally and continuously at the least cost. Anything which tends to cripple seriously or destroy an established system of transportation that is necessary to a community is not a convenience and necessity for the public and its introduction would be a handicap rather than a help ultimately in such a field."
The principle thus stated by Mr. Pond was substantially followed by this Court in the recently decided case of Florida Motor Lines v. Railroad Commissioners, wherein the Court, speaking through Mr. Justice WHITFIELD, said:
 "In this case it appears from the evidence adduced and from the proceedings had that, in making the order here challenged, the Railroad Commissioners did not give consideration to the statutory privileges claimed by the petitioner who was rendering a similar service by busses on the same route, and has adequate busses allocated to the route to amply serve the public convenience and necessity, or to the rights of the public to exclude all unnecessary vehicles, particularly those that are large and heavy, from operating for hire over the public highways that should be made and kept safe and suitable for general public use and free from undue risks and hazards to the public and from needless wearing use for hire of the roads that are maintained by the public."
Those portions of the motion to quash the writ upon the ground that the order of the railroad commissioners granting the certificate of public convenience and necessity cannot be reviewed on writ of certiorari issuing from this *Page 1038 
Court, are not well founded. This proposition has been recently considered very carefully by this Court and determined adversely to the contention of the respondents. Florida Motor Lines v. Railroad Commissioners, 129 So. R. 876. The scope of review on common law writ of certiorari, which is narrower than review on appeal or writ of error, has been outlined by this Court in several cases, among them the case just cited, and First National Bank v. Gibbs, 78 Fla. 118, 82 So. R. 618; American Railway Express Co. v. Weatherford, 86 Fla. 626, 98 So. R. 820, Atlantic Coast Line Ry. Co. v. Florida Fine Fruit Co., 93 Fla., 161, 112 So. R. 66, and Brinson v. Tharin, 127 So. R. 313. In this connection it should be noted that under the statute here under consideration a statutory presumption in favor of the validity of the rules, regulations and decisions of the Commission is created by section 8, "unless the contrary appears on the face thereof or can be made to appear by clear and satisfactory evidence," being almost identical with the language used in the older statute establishing the Railroad Commissioners, paragraph 13 of section 6703 Comp. Gen. Laws, the effect of which has been fully construed by this Court, as shown by the numerous citations under this section. And section 9 of the present act provides that in proceedings by or against the Commission in relation to its procedure, regulations, orders, etc., "all provisions of law now existing, or which from time to time may be prescribed for observance in like cases arising under the law for the regulation of railroads, railroad companies and common carriers, shall govern and control."
We come now to a consideration of those grounds of the motion to quash the writ of certiorari wherein the respondent Railroad Commissioners assert that under the terms of Chapter 13700 they are not required to take into *Page 1039 
consideration the effect that the granting of a certificate to an auto transportation company would have upon transportation by rail carriers; that rail carriers are not mentioned in either the title or body of said Act and no rights are conferred upon them by its provisions, and that therefore the petitioning railroad carriers in this case are improper parties thereto and that the writ should accordingly be quashed.
The raises a vital question. This construction of the statute by the Railroad Commissioners was evidently followed by them in their consideration of the evidence in this case and their decision thereon. If such construction is correct this writ ofcertiorari should be quashed. If it is erroneous, it supports the conclusion, based upon the record, that the Railroad Commission did not give due consideration in this case to the evidence adduced by the petitioning railway carriers going to show that they were already furnishing adequate transportation night service between the points and in the territory covered by the supplemental application of the Union Bus Company which was granted to such bus company by the order of the Commission.
As was said by this Court in the recent Florida Motor Line case:
 "If it is duly made to appear in appropriate judicial proceedings that the Railroad Commissioners have made an order that is materially injurious to legal rights or privileges, without giving appropriate consideration to matters affecting such rights and privileges, which matters the law contemplates shall be considered in making the order complained of, thereby misapplying the law in making the order, such order may be adjudged to be invalid. See Interstate Com. Comm. v. Union Pacific R. R., 222 U.S. 541, 32 *Page 1040 
Sup. Ct. R. 108, 56 L.Ed., 308. See also St. Louis Text 493, 49 Sup. Ct. R. 384, 73 L.Ed., 798."
It is true that railroad companies and railroad common carriers are not expressly mentioned by name save in Section 9 of the statute, above referred to, but they are plainly taken into consideration by subsection 6 of Section 3 of said Chapter 13700. This part of the statute provides that no certificate of public convenience and necessity shall be issued without a hearing on the application therefor, of which hearing notice shall be given to the applicant and "to all transportation companies serving any part of the route between the fixed termini," etc. The term "auto transportation company" as used in the act had already been defined in Section 1 thereof as meaning "every corporation or person, their lessees, trustees or receivers, owning, controlling, operating or managing any motor-propelled vehicle not usually operated on or over rails, used in the business of transporting persons or property for compensation or as a common carrier over any public highway in this State between fixed termini or over a regular route;" etc. Thus the language "all transportation companies," is much broader than the definition of auto transportation companies, and is certainly broad enough to cover both railroad transportation companies as well as auto transportation companies.
Furthermore, in another paragraph of subsection 6 of Section 3, it is provided that in granting an application for certificate the Commission may take into consideration certain elements named, adding thereto this language "as well as the effect that the granting of such certificate may have upon other transportation facilities within the territory sought to be served by such applicant, and also the effect upon transportation as a whole within said territory," etc. *Page 1041 
But it is inevitable that the Railroad Commission would be compelled to give consideration to "other transportation facilities" and "transportation facilities as a whole" within the territory sought to be served by the applicant, including railway transportation, in order to give full force and effect to the fundamental provision of the act, in Section 2 thereof, that: "No auto transportation company shall operate any motor vehicle for the transportation of persons or property for compensation on any public highway in this State without first having obtained from the Railroad Commission a certificate that the present or future public convenience and necessity requires or will require such operation." This public convenience and necessity is the pole-star, which primarily must guide the Commission in its administration of the statute.
The section of the statute above referred to uses the word "may" in designating the matters to be taken into consideration by the Commission upon an application; but this Court has held that where a statute says a thing "may" be done by a public official which is for the public benefit it is to be construed that it must be done. Mitchell v. Duncan, 7 Fla. 13; Jones v. State, 17 Fla. 411; Weston v. Jones, 41 Fla. 188, 25 So. R. 888. See also Graham v. City of Tuscumbia, 146 Ala. 499, 42 So. R. 400; People ex rel. v. Commissioner of Highways, 22 N.E. R. 596.
That the law is drawn upon the theory of preventing destructive competition and unnecessary use of the highways is further shown by the provision in Subsection 6 of Section 3, that in the case of an application by an auto transportation company to operate in the territory already served by a certificate holder, the certificate may be granted only where the existing certificate holder fails to provide service and facilities satisfactory to the Commission. *Page 1042 
It may throw some light on the question we are discussing to here set forth Section 776 of Pond on Public Utilities, which quotes at some length from an Illinois case:
 "These fundamental principles and the reasons on which they are based is perhaps best stated in the recent case of West Suburban Transportation Co. v. Chicago Western Towns R. Co., 309 Ill., 87, 140
N.E. R. 56, as follows: 'If the transportation facilities furnished by appellee are so inadequate as to subject the public to inconvenience, and the operation of appellant's bus lines would eliminate that inconvenience, the order of the commission was authorized. It is not the policy of the Public Utilities Act to promote competition between common carriers as a means of providing service to the public. The policy established by that act is that, through regulation of an established carrier occupying a given field and protecting it from competition it may be able to serve the public more efficiently and at a more reasonable rate than would be the case if other competing lines were authorized to serve the public in the same territory. Methods for the transportation of persons are established and operated by private capital as an investment, but as they are public utilities the state has the right to regulate them and their charges, so long as such regulation is reasonable. The policy of the Public Utilities Act is that existing utilities shall receive a fair measure of protection against ruinous competition * * * Where one company can serve the public conveniently and efficiently, it has been found from experience that to authorize a competing company to serve the same territory ultimately results in requiring the public to pay more for transportation, in order *Page 1043 
that both companies may receive a fair return on the money invested and the cost of operation. * * * Whether the public convenience and necessity require the establishment of a new transportation facility is not determined by the number of individuals who may ask for it. The public must be concerned, as distinguished from any number of individuals. Public Utilities Com. v. Toledo, St. Louis and Western Railroad Co., 286 Ill. 582, 122 N.E. R. 158. Some individuals — perhaps a considerable number — would be convenienced by the operation of the bus lines; but it is clear from the record that to the great body of the public it would be neither a convenience nor necessity. It was not within the authority of the commission to authorize the operation of the bus lines for the convenience of a small part of the public already served by other utilities at no very great inconvenience. * * * The Commission had authority to regulate the rate charged by the appellee, and if its fares were excessive to reduce them. Fares are not the only thing to be considered in a case of this kind. The public is interested and vitally concerned in adequate transportation facilities at reasonable rates, and the state is interested in assisting to get them; but the state cannot, as we have said, require a carrier to furnish service at a rate which will not pay a fair return on the investment and cost of operation. * * * The effect of authorizing the operation of the bus lines at a lower fare to serve the same territory would be to decrease appellee's revenues, and, if the rate it is now charging is a reasonable one, to require it to operate at a loss or increase its rate. This would be against the public interest, because appellant's lines cannot accommodate more than a comparatively small portion of the public in the matter of transportation." *Page 1044 
And in the leading case of Choate v. Commerce Commission,309 Ill. 248, 141 N.E. R. 12, the following appears:
 "The railroads in this country have kept pace with the industrial development and the population increase, and the prosperity of the nation has been due to a large extent to the steady expansion of the transportation system. The savings of hundreds of thousands of investors have been massed to build our great network of railroads, and these transportation systems are entitled to protection from irresponsible competition. If shoestring transportation companies, with no money invested in right of way and no reserve capital to provide adequate service, or to protect the public from damage, are permitted to drop in here and there and take the cream of the transportation business from the permanent transportation systems, disastrous results are inevitable. If the permanent highways built at the expense of the people are destroyed, these irresponsible bus lines, that profess to serve the public convenience and to supply public necessity, will leave the public to walk or to provide other transportation facilities. Orders of the public authorities to furnish adequate transportation facilities would be unavailing, because the bus lines would be wholly incapable to comply with the order. * * * If the existing transportation company does not comply with the commission's order, then a situation may arise where the public convenience and necessity will require the establishment of another system. The theory of the Public Utilities Act is to provide the public with efficient service at a reasonable rate by compelling an established carrier occupying a given field to provide adequate service and at the same time to protect the *Page 1045 
existing utility from ruinous competition. West Suburban Transportation Co. v. Chicago and West Towns Railway Co. (15273), 140 N.E. R. 56. By this method the public is protected from paying the cost of the operation of competing systems and a return upon a double investment of capital. No doubt the proposed bus line would, accommodate a few individuals in the Fox River valley, but the convenience and necessity which the law requires to support the commission's order is the convenience and necessity of the public as distinguished from that of an individual or any number of individuals."
 Again in 42 C. J. 687, it is said:
 "Where the proposed service for which a certificate is requested is to be rendered in a territory which is already served by another carrier, the commission must consider whether public convenience and necessity require further common carrier transportation service in that territory, and to this end must consider the adequacy of the service which is already rendered by the existing carrier, with which it would come into direct competition. It must consider whether the public it is proposed to serve has or has not adequate common carrier transportation service, and whether the additional service proposed to be rendered will result in more adequate or less adequate service, since to warrant the licensing of additional public utilities for transportation purposes it must appear that the present serving facilities are inadequate and inconvenient to the traveling public, and that the proposed facilities will eliminate such inadequacy and inconvenience." *Page 1046 
In the case of Gray, P. U. R. 1916 A, 33, among other things, it was said:
 "It was not the intention of the legislature to forbid all competition between utility companies. That is made perfectly clear by the wording of the law. And certainly it was not intended, either, to place the Public Service Commissions in the position of apparently preventing the people of any locality from enjoying, to the fullest extent consistent with the general good, all new improvements and conveniences as fast as these might appear. * * * We are unable to accept the view that, merely because it is now possible for these people by walking a certain distance to use the trolley, they should forever be debarred from the benefits of more immediate and convenient transportation. We have a feeling, too, that the widely differing points of view which people have upon the question whether traveling in a motor bus is as pleasant as traveling in a trolley, or vice versa, is a relevant consideration for us to give at least a little weight to in determining a matter of this kind. The two methods of transportation seem to appeal, loosely, to different publics. * * * Still, in the case of routes Nos. 3 and 5, we have somewhat reluctantly reached the conclusion that we should be violating the spirit and intent of the Public Service Commission law if we issued the certificate of convenience and necessity that is asked for. These routes parallel the trolley, upon the same streets, practically through their entire length. * * * And to permit it would be to compel the existing street railroad company to meet competition of a kind which would pretty certainly cripple it, and which might (other factors contributing) inflict irreparable injury upon it. * * * Broadly speaking, what *Page 1047 
must guide the commission in all such cases is an enlightened view of what will best, in the long run, serve the public at large."
See also, in this connection, Chicago Railways Co. v. Commerce Commission (Ill.) 167 N.E. R. 840; C. R.I. C. Ry. Co. v. State (Okla) 252 Pac. R. 849; Abbot v. Public Utilities Comm. (R.I.) 136 A. 490; Ill. Commerce Commission v. Wabash R. R., 167 N.E. R. 64; Burgess v. City of Brockton,235 Mass., 95, 126 N.E. R. 456; Lykings v. Pub. Utilities Comm., 115 Oh. St. 376, 154 N.E. R. 249, and many other cases cited in Pond on Public Utilities, Wood on the same subject, and in 42 C. J., 681-688.
As stated, in substance, in the above cited Abbot case, the word "necessity" as used in the statute does not mean an absolute and indispensable necessity, but rather that the proposed service is reasonably necessary to meet the public needs. Thus it does not necessarily follow that in all cases where a proposed bus line would substantially parallel an existing railway line that the certificate should be denied. The railway schedules and the infrequency of its stations between the termini in question, as compared with the number of the bus stations and the additional communities which the bus line would serve, and perhaps other circumstances might present a case of genuine public necessity and convenience authorizing the issuance of a certificate. In other words, the determination of the question of public convenience and necessity must to a large extent depend upon the facts of each particular case.
For the reasons above pointed out, the motion of the respondents to quash the writ of certiorari is denied.
There are certain irregularities in the form and method by which the record of the proceedings before the Railroad Commissioners in this case has been made up and presented *Page 1048 
to this Court, but as no objection has been made thereto by either side to the controversy, and the cause argued and submitted without reference thereto, we will deem such possible objections as having been waived and proceed to a consideration of the evidence.
The evidence in this case shows that the proposed bus line service practically duplicates passenger service rendered by the petitioning railroads over the same route, the schedule authorized by the order being substantially the same as the train schedule between New Orleans and Jacksonville; that the existing railroad service was amply sufficient to care for all traffic offered, and that the carriers were able and willing to expand service to provide for any increased demand. It further appears that the establishment of the proposed service would take passengers away from these railroads and that practically all the passengers who would use this bus service would be taken from the railroads.
It also appears that there could be but little new local traffic on the night schedules applied for especially in view of the existing daylight bus service in addition to the existing railroad day service. It also appears that if, as has been sometimes suggested, bus service affords the passenger a better opportunity to view the country through which he passes, this feature would not apply to the night service in question. It is further shown in the evidence that the passenger traffic over the railroad lines in question has been seriously curtailed by private automobiles and motor bus lines and that the subtraction from passengers of those now using the railroad service in question would further seriously impair passenger earnings, and would permit a probably destructive competition with the through night passenger traffic which still remains with the railroads, which would tend to produce heavy public burdens in the way of *Page 1049 
increased freight rates. It is suggested that the bus line will furnish the convenience of the "stop and pick up" service and that the fare is cheaper than the railroads. But it does not appear that this feature of the bus service would be more than a slight convenience to a limited number of people and that as to this night service it does not constitute any considerable factor, amounting to a public necessity, within the meaning of the law. And a cheaper rate, as we have seen, does not of itself authorize the granting of a certificate. On the other hand it appears that the railroads perform certain vital services to the public as to night schedules which the bus company cannot perform. They furnish sleeping accommodations, meals and other accommodations, such as toilet facilities, on the trains and furnish the usual facilities at all stations. As has been pointed out, the bus route in this case parallels the railroads and serves the same stations on practically the same schedule; and as the evidence shows that the service rendered by these railroads on their night schedule covering the route and touching the points in question is entirely adequate to meet the public necessity and convenience, we do not see that there was any foundation in the evidence for an authorization to the bus line to duplicate the existing through night service afforded by the petitioning railroads.
As above intimated, the motion to quash indicates that the Railroad Commissioners were of the opinion that they could not, under the statute, take into consideration the service rendered by the railroad carriers, and no doubt a different order would have been rendered but for their construction of the statute in this respect.
As it appears from the evidence adduced and the proceedings had, that in making the order here challenged, the Railroad Commissioners did not give due consideration to the existing railroad service over the route and between the *Page 1050 
termini designated in the application, we conclude in this case, as in the Florida Motor Line case, supra, that the order as made is not warranted by the showing made in the record under the law that is applicable thereto; therefore the motion to quash the writ of certiorari is denied and the order complained of is quashed.
TERRELL, C. J., and ELLIS, J., concur.
WHITFIELD, P. J., and STRUM, J., concur in the opinion and judgment.