MISSISSIPPI PUBLIC SERVICE COM-
MISSION, Plaintiff,

v.

The UNITED STATES of America and
the Interstate Commerce Commis-
sion, Defendants.

Civ. A. No. 2120.

United States District Court,
S. D. Mississippi, Jackson Division.

Sept. 21, 1954.

James T. Coleman, Atty. Gen., James
T. Kendall, Sp. Asst. Atty. Gen., Dugas

Shands, Jackson, Miss., for Mississippi Public Service Commission.

J. C. Floyd, Meridian, Miss., for Flintkote Co.

Henry Hilbun, Jr., of Deavours & Hilbun, Laurel, Miss., for Masonite Corp.

Roland W. Heidelberg, Jr., Hattiesburg, Miss., for all remaining intervening plaintiffs.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., Stanley N. Barnes, Asst. Atty. Gen., Willard P. Memler, Sp. Asst. Atty. Gen., for United States.

Allen Crenshaw, Associate Chief Counsel of Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

Harold E. Spencer, Chicago, Ill., Y. D. Lott, Mobile, Ala., Byrd, Wise & Smith, Jackson, Miss., Ben F. Cameron, Meridian, Miss., for the Railroads.

Before HOLMES, Circuit Judge, and MIZE and THOMAS, District Judges.

MIZE, District Judge.

This is an action seeking to annul, set aside, and permanently enjoin enforcement of an order of the Interstate Commerce Commission entered February 1, 1954, in accordance with the report findings and conclusions entered November 2, 1953, in the proceeding No. 31164, Mississippi Intrastate Freight Rates and Charges, under which the respondent rail carriers operating in Mississippi were required to establish intrastate freight rates and charges in Mississippi no lower than the rates and charges prescribed and provided for in said report. The action was filed by the Mississippi Public Service Commission against the United States and the Commission, and served upon the Commission March 15, 1954. Answers have been filed by the United States, by the Commission, and railroad respondents operating in Mississippi. Certain shippers and associations, as named in the several motions, have intervened in support of the Mississippi Commission. The case was heard on its merits and upon an application for a temporary injunction by consent at the same time. The temporary injunction was granted pending a final judgment.

The Commission proceedings were instituted October 17, 1952, upon the filing of a petition by seventeen railroads, with a supplemental petition filed November 21, 1952, seeking an order, after investigation, to authorize increase of intrastate freight rates in Mississippi, to the same extent and in the same manner as authorized by the Commission in respect to interstate rates and charges, in Ex parte No. 175, Increased Freight Rates, 1951, 284 I.C.C. 589, hereinafter referred to as X–175. The railroads had, prior to filing petitions with the Commission, filed petitions with the Mississippi Commission, seeking approval of the increased rates, which were denied by order of that Commission, entered November 8, 1952. By order of December 5, 1952, Division 1 of the Commission ordered such investigation and a hearing before an examiner for February 2, 1953, at Jackson, Mississippi.

After the hearing a report by Examiner Vandiver was filed and served on May 27, 1953. The proposed report found that the intrastate rates imposed by the Mississippi Commission on cottonseed and products thereof, soy beans and products thereof, fertilizer and fertilizer materials, lumber and articles listed as taking the lumber rates, pulpwood, sand and gravel, cement, brick and related articles in the brick list, and refined petroleum in tank cars, were abnormally low, and traffic thereunder fails to produce its fair share of revenue to enable railroad respondents to provide adequate and efficient service, and such rates cause undue, unreasonable, and unjust discrimination against interstate commerce. The Mississippi Commission and three protestants filed exceptions to said report, and respondent railroads filed reply thereto.

The Commission entered its report on November 2, 1953, 291 I.C.C. 39. Ultimate findings of the Commission are set forth in the report and are substantially the same as those proposed by the Examiner. The report provided that an or-

der would be issued making the findings effective, unless notified within 30 days after service, by the Mississippi Commission, that it would promptly permit the approved increases. Upon petitions of the Mississippi Commission, the Commission, by orders dated November 25 and December 23, 1953, extended the date on which such notification should be given to February 1, 1954. The Mississippi Commission and three protestants filed petitions for reconsideration of the report of November 2, 1953, which were denied by the Commission order of February 1, 1954, under which respondent railroads were ordered to establish the intrastate rates prescribed for the commodities named in the report, on March 19, 1954, effective upon five days' notice. Petition of the Mississippi Commission was filed March 9, 1954, to amend the order of February 1, 1954, so as to remove therefrom the requirement to increase intrastate rates on refined petroleum in tank cars. By Commission order of March 10, 1954, the order of February 1, 1954, was so amended.

The Commission authorized, in X-175, a general increase of fifteen percent on basic interstate freight rates and charges, subject to certain exceptions and modified increases, which was the fourth general increase since World War II. The railroads operating in Mississippi filed petition with the State Commission, seeking the same increases on intrastate rates and charges as authorized on interstate rates under X-175.

The Mississippi Commission had a full hearing and authorized an increase in intrastate rates and charges of the full fifteen per cent on all less than carload freight and upon all carload freight, except as to carload line haul rates of brick and related articles upon which the Mississippi Commission granted no increase, cement, upon which the Mississippi Commission granted no increase, fertilizer and fertilizer materials, upon which the Mississippi Commission authorized a six per cent increase, lumber, upon which the Mississippi Commission authorized a six per cent increase, pulp-wood, upon which the Mississippi Commission authorized a six per cent increase, sand and gravel, upon which the Mississippi Commission granted no increase, cottonseed and products thereof, upon which the Mississippi Commission authorized a six per cent increase, soya beans and the products thereof, upon which the Mississippi Commission authorized a six per cent increase, cattle feed made 65 per cent or more of cotton seed or soya bean products, upon which the Mississippi Commission authorized a six per cent increase, and refined petroleum in tank cars, upon which the Mississippi Commission authorized an increase of six per cent. Upon all of the commodities excepted the increase authorized by the Interstate Commerce Commission was fifteen per cent with the single exception of sand and gravel upon which the interstate increase was twelve per cent.

Cattlefeed made 65 per cent or more of cottonseed or soya bean products is not involved in this case as same was excepted from the report and order of the Interstate Commerce Commission. Refined petroleum in tank cars is likewise not involved in this proceedings for the reason that, by order dated February 23, 1954, the Mississippi Commission ordered that the intrastate rates for that commodity be increased the full fifteen per cent authorized in Ex parte No. 175. All of the remaining excepted commodities are in issue, there being involved the differential in the increases authorized by the Mississippi Commission and the Interstate Commerce Commission as outlined above.

The Commission report, finding 3, prescribed the interstate increase on all the commodities excepted by the Mississippi Commission. The rates involved herein relate only to said excepted commodities as an issue, of which refined petroleum in tank cars was removed by the Commission order of March 10, 1954, entered after the Mississippi Commission had approved the interstate increase for that commodity.

The ultimate issue relates to the validity of the orders of the Commission requiring the rail carriers to increase their Mississippi *intrastate* rates and charges to the same level prescribed in the report of November 2, 1953. Section 13(4) prohibits two types of preference and discrimination, in respect to intrastate and interstate rail rates, preference and prejudice as to persons and localities, and discrimination against interstate commerce. The Commission report of November 2, 1953, found that no evidence was offered as to undue prejudice to interstate shippers. The remaining issue relates only to discrimination against interstate commerce. Paragraphs XII and XIII of the complaint allege illegality of the final report and order of the Commission, on grounds there stated of violation of constitutional rights; action beyond the scope of statutory authority; unsupported by substantial evidence or contrary to evidence; and arbitrary action.

The paramount question for determination is whether or not there was substantial evidence to support the finding of the Commission. The law in recent years has been fully announced and declared by the Supreme Court.

■■ The Interstate Commerce Commission has no general authority to regulate intrastate rates. The mere existence of a disparity between interstate and intrastate rates does not authorize the Commission to enter a field properly consigned and belonging to the state regulatory body and interfere with rates established by state authority. Section 13(4) of the Interstate Commerce Act, 49 U.S.C.A. § 13(4), does not automatically require complete uniformity in intrastate and interstate rates but the state commission may fix a lower intrastate rate than the interstate rate, unless an undue advantage to intrastate traffic and an unfair discrimination against interstate traffic results therefrom. This rule was properly and clearly declared by the Supreme Court of the United States in the case of State of North Carolina v.

United States, 325 U.S. 507, 65 S.Ct. 1260, 89 L.Ed. 1760.

■ The true rule is that, whenever the Commission attempts to exert the power to interfere with intrastate rates which are otherwise in the dominion of state regulation, the justification for the exercise of such power by the Commission must clearly appear of record. Otherwise, the Commission's action is a clear and unlawful encroachment upon the reserved power and authority of the state.

■ In order to authorize the Commission to exercise the power to nullify intrastate rates under Section 13(4) of the Act, it must be shown, among other things, (a) that the intrastate rates involved are abnormally low and are not contributing their fair share of the revenue of the carriers involved; (b) that the disparity between the rates is substantial and operates as a real discrimination against and obstruction to interstate commerce; (c) that injury to interstate shippers has resulted and will continue to result because of the disparity in rates; (d) that the proposed rates are just and reasonable; and (e) that a substantial increase in the carriers' revenue will result from the proposed increase in the intrastate rates. State of North Carolina v. United States, supra. The Court further held in that case that the power of the Commission to require states to raise their intrastate rates depends upon whether intrastate traffic is contributing its fair share of the earnings required to meet maintenance and operation costs and to yield a fair return on the value of the property directed to the transportation service both interstate and intrastate. Moreover, it reaffirmed the doctrine that the Commission could not require intrastate rates to be raised above a reasonable level.

■ The Interstate Commerce Commission is granted wide powers to prescribe rates on interstate freight as well as other transportation matters. That function belongs primarily and exclusively within the limits of the Act to the

Commission; however, its authority over intrastate rates is limited as above set out and Section 13(4) of the Act was never intended to deprive the state commission of their primary authority to regulate intrastate rates. There is a point where the power of the state commission ceases and the power of the Interstate Commerce Commission begins, but as stated by Mr. Justice Black in the North Carolina case, it is not always easy to designate that point.

 Other principles of law have been clearly declared by the Supreme Court of the United States. Intrastate traffic must bear a fair proportionate share of the costs of maintaining an adequate railway system. Railroad Commission of Wisconsin v. Chicago B. & Q. Railway, 257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371. It is within the power of the Interstate Commerce Commission to determine if the intrastate rates do that; however, before it can alter intrastate rates the justification therefor must clearly appear and be supported by substantial evidence. It is not sufficient that there be simply a difference between interstate rates fixed by the Commission and the intrastate rates as fixed by the state commission. The fixing of intrastate rates is primarily the duty of the state commission and the record in this case demonstrates that the Mississippi Commission gave great study and investigation and heard much testimony before the Commission itself and not through an examiner. If the evidence is substantial to support the finding of the Interstate Commission, then its power and its conclusions override that of the state commission, but a mere disparity of itself in the rates fixed by each commission is not sufficient. State of Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291. Whenever the findings of the Commission are supported by substantial evidence, then the findings of such commission are conclusive upon the courts, but if such findings are not supported by substantial evidence, then the matter is one for the court to determine

and such order cannot be upheld. In determining in the first instance whether intrastate rates should be raised or lowered the Interstate Commerce Commission is allowed wide latitude in directing that intrastate rates be increased and may take into consideration material and reports which were before the Commission in previewing a nationwide increase in interstate freight rates. The Commission's jurisdiction over intrastate rates is not limited to cases where those rates are confiscatory. King v. United States, 344 U.S. 254, 73 S.Ct. 259, 97 L.Ed. 301.

The Court in reviewing an order of the Interstate Commerce Commission has the duty to study the entire record and it is the function of the Court to determine from the whole record whether or not there was substantial evidence before the Commission upon which its order could be based. If there were no substantial evidence then it is the duty of the Court to set aside such order and enjoin its enforcement. Congress in enacting in 1946 the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., made it mandatory that the reviewing court should set aside an order that was unsupported by substantial evidence and that it should review the whole record in making the determination. The Supreme Court of the United States in Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456, held that in determining what is substantial evidence that the Court must take into consideration whatever in the record fairly detracts from its weight. Under the decision in that case it is the duty of the reviewing court when it cannot conscientiously find that the evidence supporting the order of the Commission is substantial, when viewed in the light that the record in its entirety furnishes, including the body of the evidence opposed to the Board's view, to set aside the order of the Commission.

 Substantial evidence is a legal term and presents to the court for adjudication a question of law. It is a term

that frequently appears in the construction of many laws. There are many instances in which judgments are required to be supported by substantial evidence. The verdicts of juries in some states are required to be supported by substantial evidence and it then becomes a question for determination by the court as to whether or not a verdict is supported by substantial evidence and if it is not, then the court reverses and directs that judgment be entered when not supported by substantial evidence. The decisions on this matter are numerous. See 40 Words and Phrases, Substantial Evidence, and Annual Pocket Part. Substantial evidence is a term that cannot be defined definitely, but whether the evidence in a particular case amounts to substantiality must be determined from the facts of each case as it arises.

 The order in this case when viewed in the light of the entire record and all of the circumstances leading up to its passage and giving weight to all things that detract from the sufficiency of the evidence is not supported by substantial evidence and must be set aside and its enforcement enjoined. It is a delicate duty placed upon the reviewing court to determine the line of demarkation and to adjudicate the point where the authority of the state commission ends. The court does not have the power to settle disputes in the testimony, but it must consider the entire record and determine as a matter of law if there was substantial evidence to support the order. The record shows that in making the investigation for the nation as a whole in Ex parte No. 175 that the Commission at that time was making a determination that the intrastate rates should be increased as well as the interstate rates. That will not do. There must be a finding based upon substantial evidence after a full investigation that the intrastate rates are abnormally low and that traffic thereunder fails to produce its fair share of the earnings to yield revenue sufficient to accomplish the purpose of interstate commerce. The record does not bear out any substantial evidence to this effect. There was no separation made by the railroads of their revenues, expenses and properties as between interstate and intrastate operations. So far as the record shows, it could be fairly assumed that the rates fixed by the Mississippi Commission were not abnormally low but were bearing a fair percentage of revenue for the operation of the carriers. The record of the evidence in the case reflects a favorable financial condition of the railroads involved herein when contrasted with that of the railroads of the country as a group. The statistics introduced in evidence and reflected by the various reports show that the national average of returns for the railroads was 4.02 per cent; whereas, the condition of the railroads involved in this controversy was in a better financial situation and their earnings greater than the 4.02 per cent. The Interstate Commerce Commission in Ex parte No. 175, when granting freight rate increases took into consideration the losses sustained by the railroads in passenger operations. This was correct and was upheld in King v. United States, 344 U.S. 254, 73 S.Ct. 259, 97 L.Ed. 301, but in determining the intrastate rate in Mississippi the Commission refused to take into consideration the lower passenger deficits which prevailed in Mississippi. There is no testimony in the record having probative force showing that the rates in Mississippi were abnormally low other than the disparity that exists between the interstate rates and the intrastate rates which within itself is not sufficient. Different conditions, circumstances and situations in different states require and justify different results in fixing intrastate rates. The findings of a state commission which is familiar with such conditions in the state, with the location of competing highways and other forms of carriers, when its opinion differs from the Interstate Commerce Commission's findings detracts heavily against the findings of the Interstate Commerce Commission,

whose testimony is taken before an examiner. The record shows in this case that the need of the carriers involved here for additional revenue is not as great as the needs of the railroads of the country as a whole. The statistics introduced in evidence and now in the record demonstrate this.

The testimony of the various witnesses who are shippers of many of the products involved herein demonstrates that if the rates are permitted to stand as fixed by the Interstate Commerce Commission, the income of the railroads will be reduced rather than increased. Many of these are shippers themselves and testified positively and unequivocally that it would be economy for them to use their own individual trucks or private carriers by truck, who are unregulated so far as rates are concerned in Mississippi. When the intrastate freight rate level on a given commodity is at such level that any increase in the rate would have the effect of diverting traffic from the rail carriers to competing forms of transportation, then it would follow that the revenue derived would be diminished rather than increased. In fixing reasonable rates competition is one of the elements to be considered and is frequently controlling. See Interstate Commerce Commission v. Chicago Great Western Railway Co., C. C., 141 F. 1003. In determining the legal question as to whether the evidence amounts to substantiality and in adjudicating whether there was substantial evidence or not, the court likewise must weigh such factors. The record shows in this case that the Mississippi Commission was thoroughly familiar with the competition prevailing and with the location of the sites for gravel, the location of the highways and as a matter of fact, in better position to determine the effect of competition upon the carriers than is the Interstate Commerce Commission, but, of course, its findings must yield to those of the Interstate Commerce Commission, if the record as a whole shows that there was substantial evidence.

The Interstate Commerce Commission found that the increase granted in the rates by it would produce more than $550,000 annually on all of the commodities involved. This finding was based upon estimates made by experts of the railroad companies that such revenue would be produced if the rate increase be given. The testimony upon this proposition is exceedingly weak. It is based upon the presumption that the same amount of freight traffic would continue under the increased rate as had theretofore been carried at the lower rate. This assumption and opinion is contrary to the sworn testimony of those who were in position not only to know but also to control large quantities of the products upon which the rate was increased. The evidence to support this finding when weighed in the light of the prevailing rule of law is not sufficient to amount to substantial evidence.

The testimony of the various witnesses and experts who testified for the carriers along with their many exhibits, opinions and tests has not been overlooked but their testimony has been fully weighed in the light of the entire record and proceedings in this cause and when viewed in this light the testimony fails to show substantiality sufficient to uphold the order here under attack and the findings that were made by the Interstate Commerce Commission. It would unduly prolong this opinion to undertake to point out in detail the testimony of the various witnesses and the things that detract from the substantiality of the evidence, but it is demonstrated more closely with reference to sand and gravel, the pulpwood and the fertilizer and cement that is involved. The record is clear in this case that the revenue needs of the railroads of the Eastern District and in the South or Western District and the financial condition of the petitioning railroads involved in this case are in better condition than the national average.

On the trial before this Court there was introduced in evidence Plaintiff's Exhibit 4, which was a petition by the rail-

roads made to the Interstate Commerce Commission seeking a modification of the Commission's order so as to authorize lower rates upon sand and gravel and Plaintiff's Exhibit 5, being an order thereon granting the prayer of the petition. There was no objection to the introduction of these documents but even if they should have been irrelevant as having occurred since the filing of the suit, it still would be true that there was not sufficient substantial evidence to support the order but if these documents be considered, they simply demonstrate that the higher rate given the railroads would cause the traffic to divert to competitors. The commodities involved in this controversy require shorter hauls than do the interstate shipments and are therefore more susceptible to competition. On all of the commodities involved in the controversy the competition by carriers is keen and would come not only from regulated trucks for hire but from unregulated trucks and from trucks owned and operated by the shippers themselves. This is clearly shown by the record by positive testimony and overwhelmingly overthrows and overrides the opinions of the experts.

The Interstate Commerce Commission committed an error of law in disregarding the evidence that passenger deficits in Mississippi were substantially lower than in the South or the nation as a whole. The Mississippi Commission offered evidence showing that passenger deficits in Mississippi were substantially less than passenger deficits of the same railroads for their system-wide operation and according to the statistics introduced there was a vast difference. Passenger deficit is an element to be taken into consideration in rate making by the Interstate Commerce Commission, and as a matter of law, it is the duty of that Commission to consider it in determining whether rates should be increased or decreased, and if the passenger deficit in Mississippi was less than that of the nation as a whole, it was the duty of the Commission to give proper consideration to this testimony. King v. United States, supra.

At the time the original complaint herein was filed and at the time of the hearing and when the case was submitted to the Court for judgment, cement in carload lots was one of the commodities involved and an intervention by the Marquette Cement Manufacturing Company was allowed but since that date the Marquette Cement Manufacturing Company, one of the intervening plaintiffs, moved to be permitted to withdraw its intervention for the reasons stated in the motion and likewise the plaintiff moved to amend its complaint so as to eliminate cement from the commodities at issue and without objection an order was entered on the 13th day of September, 1954, sustaining each of said motions. The complaint was amended so as to eliminate cement and the petition of the Marquette Cement Company was dismissed for the reasons stated in said motions, there being no objections from any one to these motions.

For the reasons herein stated the order of the Interstate Commerce Commission will be set aside and its enforcement enjoined.

Order may be drawn in accord herewith.

THOMAS, District Judge (dissenting).

As stated by Judge Mize in the majority opinion, the paramount question for determination is whether or not there was substantial evidence to support the finding of the Commission. The law is well settled "that an order of the Commission is entitled to finality, and may not be set aside, modified or disturbed on judicial review, if such order of the Commission lies within the scope of the Interstate Commerce Statute, and is based upon adequate findings that are supported by substantial evidence."[1] There

1. Louisiana Public Service Comm. v. United States of America and the Interstate Commerce Comm., D.C., E.D. of La., 125 F.Supp. 180.

**818**

is no question but that the order of the Commission lies within the scope of the statute. In discussing the limitation upon the right of courts to review orders of the Commission, in the case of Interstate Commerce Commission v. Union Pacific Railroad Company, 222 U.S. 541, 32 S.Ct. 108, 111, 56 L.Ed. 308, the court said:

"In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the Commission acted within its power. It will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. 'The findings of the Commission are made by law prima facie true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience.' Ill. Cent. v. Interstate Commerce Comm., 206 U.S. 441, 27 S.Ct. 700, 51 L.Ed. 1128. Its conclusion, of course, is subject to review, but, when supported by evidence, is accepted as final; not that its decision, involving, as it does, so many and such vast public interests, can be supported by a mere scintilla of proof, but the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order."

In my opinion, the findings made by the Commission in support of its conclusion are entirely adequate, and fulfill the needs emphasized in the case of State of North Carolina v. United States, 325 U. S. 507, 65 S.Ct. 1260, 89 L.Ed. 1760.

The record must be considered as a whole. I have considered the record as a whole and am of the opinion that on the authority of King v. United States, 344 U.S. 254, 73 S.Ct. 259, 97 L.Ed. 301, the order complained of has a rational basis in adequate findings, which are supported by substantial evidence.

I respectfully dissent from the majority opinion.