## MISSOURI PAC. R. CO. v. CHICAGO, R. I. & P. RY. CO.
### No. 8782.

Circuit Court of Appeals, Eighth Circuit.
May 12, 1930.

Robert E. Wiley, of Little Rock, Ark. (Edward J. White, of St. Louis, Mo., on the brief), for appellant.

Thomas S. Buzbee, of Little Rock, Ark. (W. F. Dickinson, of Chicago, Ill., and George B. Pugh and H. T. Harrison, both of Little Rock, Ark., on the brief), for appellee.

Before BOOTH and GARDNER, Circuit Judges, and SANBORN, District Judge.

BOOTH, Circuit Judge.

This is an appeal from a final decree granting a permanent injunction against appellant Missouri Pacific Railroad Company, defendant below, restraining it from constructing a railroad track across certain property and railroad tracks of appellee within the city of Little Rock, Ark., and from prosecuting a petition presented by appellant to the Arkansas Railroad Commission (which petition asked that body to determine that the petitioner have a grade crossing over the tracks of the appellee in accordance with such terms of installation, operation, and maintenance as might be determined by said Railroad Commission), until appellant had first obtained from the Interstate Commerce Commission a certificate of convenience and necessity for the construction of the proposed track, of which the proposed crossing was a part. The parties will be designated for brevity Missouri Pacific and Rock Island.

The undisputed facts disclosed at the trial and leading up to the decree are substantially as follows:

'The City of Little Rock is on the south side of the Arkansas River with cross-streets, designated with Roman numerals (except the first street, which is named Markham Street), which run east and west parallel with the river, commencing with Markham (or First) Street near the south bank of the river. These are intersected with streets running north and south which bear names, one being Main Street, which is the principal business street, and the others running parallel with Main on the east and west thereof. One of the Missouri Pacific's main lines operating out of Little Rock southeastward towards Louisiana extends through Little Rock on the south bank of the Arkansas River, occupying the south bank for approximately one and one-half miles, being about three-quarters of a mile on each side of Main Street. At a point about three-quarters of a mile west of Main Street it intersects the other Missouri Pacific main line, which runs approximately north and south from St. Louis to Texas. About ten city blocks east of Main Street, at a street named McLean Street, the Rock Island's main line enters Little Rock from the north, crossing the river on a bridge at that point and at once crossing the aforesaid main line of the Missouri Pacific, and running on southward for approximately one and one-half miles, then turning westward encircling the city on the south and on the west and coming back to the river (necessitating another crossing over the main line of the Missouri Pacific which runs southward into Texas) about one mile west of Main Street and thence extending westward towards Oklahoma.

'The existing freight station of the Missouri Pacific is located on Markham Street and approximately between Collins and McLean Streets at a point where the Rock Island's main line crosses the Missouri Pacific's main line as aforesaid, about ten blocks east of Main Street on the south bank of the river. The Rock Island's main line at that point separates the buildings of this freight station so that the outbound traffic is handled in a building on one side of the Rock Island main line and the inbound on the other side.

'The principal wholesale business of the City of Little Rock is located in the territory bounded on the west by Main Street, north by the Arkansas River, east by the Rock Island main line aforesaid, and south by East Third Street. South from East Third Street, between Main Street and the Rock Island main track, is mainly a residential section, with business gradually encroaching from East Third Street southward.

'The principal retail district is on Main Street, and for some blocks westward there-

from extending from the river southward for eight or ten blocks.

'The Missouri Pacific has acquired by purchase three city blocks of land bounded on the north by East Fourth Street, on the south by East Fifth Street (also called East Capitol Avenue), and on the west by Commerce Street (which is the fourth street east of Main Street), and on the east by Rector Street (which is the seventh street east of Main Street); has procured the city of Little Rock to pass an ordinance vacating the two intervening streets to be included in the area of the proposed new freight station; and has procured the necessary right-of-way for one track approximately 3,700 feet long, connecting at the east end thereof with the Missouri Pacific's freight yards in east Little Rock at a point approximately 1,250 feet east of the Rock Island main line and extending westward and across the Rock Island main line, and thence continuing westward to the location of the proposed new freight station. It also has procured right-of-way for necessary team tracks and other service tracks from this main lead track into the new station. None of these service tracks, however, cross the Rock Island, but all connect with the lead track at a considerable distance westward from the Rock Island main line. The Missouri Pacific bought all the ground and right-of-way as aforesaid and obtained deeds therefor, except three small city lots, and for those three lots it brought and has pending condemnation proceedings to acquire them for the purpose of the freight station.'

Having acquired the property and the right of way as aforesaid, the appellant then applied to the Railroad Commission of Arkansas for a crossing over the tracks of appellee. Before the date fixed for the hearing, appellee filed the present suit in the United States District Court for the Eastern District of Arkansas.

The main question raised is: Whether the proposed construction by the appellant constitutes an extension of its line of railroad within the meaning of paragraph 18 of section 1 of the Interstate Commerce Act as amended by the Transportation Act of 1920 §402 (49 USCA § 1(18).

Statutory provisions cited as relevant are:

49 USCA § 1, par. (3): "The term 'railroad' * * * shall include * * * all switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein [to-wit: interstate transportation], including all freight depots, yards, and grounds, used or necessary in the transportation or delivery of any such property."

49 USCA § 1, par. (18): "No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad * * * unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity require or will require the construction * * * of such * * * extended line." Paragraph (22): "The authority of the commission [so] conferred * * * shall not extend to the construction * * * of spur, industrial, team, switching, or side tracks, located or to be located wholly within one State." Paragraph (20): "Any construction * * * contrary to the provisions * * * of paragraph (18) * * * may be enjoined by any court of competent jurisdiction at the suit of * * * any party in interest."

Evidence was introduced at the trial tending to show that the proposed location of the new freight depot of the Missouri Pacific with its attendant tracks would be less than two blocks southwest of the present freight depot and attendant tracks of the Rock Island; that the proposed track of the Missouri Pacific leading to the proposed freight depot would cross the main track and at least two switch tracks of the Rock Island; that the territory south of Markham street down to between Third and Fourth streets was industrial property, and that industries about eighty in number were served by the tracks of the Rock Island extending into that locality; that the territory to the south of Third street was largely residential, but considered as potential industrial property; that the industrial part of this whole territory was served by the Rock Island tracks, and that it was feasible for Rock Island tracks to be constructed so as to serve future industries in the territory; that the Rock Island was willing to furnish the facilities as needed; that the Rock Island industry tracks already in the territory are open to the Missouri Pacific in reciprocal switching service; that the business now furnished to the Rock Island from the territory in question is very important, constituting over 50 per cent. of its business originating or terminating at the Little Rock station; that approximately 75 per cent. of this business is interstate; that of the total freight business at Little Rock station approximately 66⅔ per cent. is handled by the Missouri Pacific, leaving 33⅓ per

cent. to be divided between the Rock Island and the Cotton Belt.

There was evidence tending to show that the proposed new track of the Missouri Pacific would cross three tracks of the Rock Island, and that a fourth track, a switching lead, was contemplated at this point; that the proposed crossing was in the passenger yards of the Rock Island and at the south entrance of its freight yard; that the proposed track was about 3,700 feet long (1,250 feet east of the proposed crossing and 2,450 feet west); that the movements at this point of Rock Island engines and trains amounted to between 350 and 400 daily; that the proposed crossing would seriously interfere with both the passenger and freight business of the Rock Island; that if the proposed construction is made, the passenger depot, freight depot, passenger yard, and freight yard of the Rock Island would be embraced between two crossings of the Missouri Pacific with the Rock Island, which would be about 1,676 feet apart.

On the other hand, there was evidence tending to show that the present freight depots of the Missouri Pacific were congested and outgrown; that the proposed new freight depot and the track leading to it and the tracks attendant upon it were intended primarily to afford better facilities to the whole city of Little Rock; that there was no intention to try to get the business of the industries already served by the Rock Island; that the interference with Rock Island movements at the crossing would not be of such extent as to be serious.

There was, however, evidence that the petition of the Missouri Pacific to the Railroad Commission of Arkansas stated that one of the purposes of the proposed location of the new freight station was "to serve such industries as may locate in the territory adjacent to the route of the proposed tracks and freight station"; that the petition also stated, "the territory lying between the Chicago, Rock Island & Pacific Railway Company's right-of-way and the location of petitioner's proposed freight station through which petitioner's proposed track is projected is conveniently adapted to the use of industries which could be served by industry tracks connected with petitioner's proposed track and which can be served from the track as located on the grade projected and proposed by petitioner, and the continued growth and development of the commerce of the City of Little Rock justifies and requires the location of industries there and will develop industries along the route of petitioner's said track and within the territory above named if the said track is constructed at the grades as proposed by petitioner for a grade crossing of the Rock Island."

One of the witnesses for the Missouri Pacific testified as follows:

"The territory I referred to down Third and Fourth Street and Fifth Street has not shown much signs of changing from resident to business property until right lately. There was no development in there. I think it is very good industrial territory. I would not say that additional development will have to be in there, but I believe that if the Missouri Pacific makes this investment in the freight station in that locality it is soon going to be quite an attractive industrial territory. It is practically level ground with no particular construction difficulties. I know of no difficulty the Rock Island would have in getting its tracks into any industry existing down there, other than getting permission to cross streets and alleys. I think they could put tracks in that territory. The Missouri Pacific doesn't reach that territory now with tracks."

Another witness testified as follows:

"At the present time there will be no industries served by these tracks, and the industrial track proposition is connected with that layout in that it is the railroad's idea that our service may attract some industries into that particular territory. In fact, we feel that it is a good industrial territory that can be served by our railroad later on if and when they come there."

"While it is not our present intention to serve any industries on this track, I would not be a very good railroad man if I did not hope that some might come there. The track shown on the plat crossing Block 15 and going to the south was proposed to serve the Chevrolet parts distribution plant which at one time contemplated going in there; it was a two-car track. On the plat a track is shown about the middle of the block between Third and Fourth. If an industry located north of Third Street and should build a track across that half block to us we would permit them to connect with us; we would be glad to do so. We have considerable property in there which we hope to develop as industrial, but we can't get into it now with any tracks we now have."

There was other evidence to the same effect; and the blueprints introduced by the Missouri Pacific showing the proposed construction seemed to indicate the same general purpose.

In determining whether the proposed construction constitutes an extension of the line of railroad of the Missouri Pacific or mere spur, industrial, team, switching, or side tracks, regard must be had to the words, the context, and the railroad policy disclosed by the provisions of the Transportation Act of 1920.

In Dayton-Goose Creek Ry. Co. v. United States, 263 U. S. 456, page 478, 44 S. Ct. 169, 172, 68 L. Ed. 388, 33 A. L. R. 472, the Supreme Court, speaking by Chief Justice Taft, said:

"* * * The Transportation Act adds a new and important object to previous interstate commerce legislation which was designed primarily to prevent unreasonable or discriminatory rates against persons and localities. The new act seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country. It aims to give the owners of the railways an opportunity to earn enough to maintain their properties and equipment in such a state of efficiency that they can carry well this burden. To achieve this great purpose, it puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the Commission which is to supervise their issue of securities, their car supply and distribution, their joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for intrastate commerce, to secure a fair return upon the properties of the carriers engaged. * * *

"It is insisted here, that the power to regulate interstate commerce is limited to the fixing of reasonable rates and the prevention of those which are discriminatory, and that when these objects are attained, the power of regulation is exhausted. This is too narrow a view of the commerce clause. To regulate in the sense intended is to foster, protect and control the commerce with appropriate regard to the welfare of those who are immediately concerned, as well as the public at large, and to promote its growth and insure its safety."

In Texas & Pac. Ry. Co. v. Gulf, etc., Ry. Co., 270 U. S. 266, pages 277, 278, 46 S. Ct. 263, 266, 70 L. Ed. 578, the Supreme Court, speaking by Mr. Justice Brandeis, said:

"A truer guide to the meaning of the terms 'extension' and 'industrial track,' as used in paragraphs 18 to 22, is furnished by the context and by the relation of the specific provisions here in question to the railroad policy introduced by Transportation Act of 1920. By that measure, Congress undertook to develop and maintain, for the people of the United States, an adequate railway system. It recognized that preservation of the earning capacity, and conservation of the financial resources, of individual carriers, is a matter of national concern; that the property employed must be permitted to earn a reasonable return; that the building of unnecessary lines involves a waste of resources, and that the burden of this waste may fall upon the public; that competition between carriers may result in harm to the public, as well as in benefit; and that, when a railroad inflicts injury upon its rival, it may be the public which ultimately bears the loss. * * *

"When the clauses in paragraphs 18 to 22 are read in the light of this Congressional policy, the meaning and scope of the terms 'extension' and 'industrial track' become clear. The carrier was authorized by Congress to construct, without authority from the Commission, 'spur, industrial, team, switching or side tracks * * * to be located wholly within one state.' Tracks of that character are commonly constructed, either to improve the facilities required by shippers already served by the carrier or to supply the facilities to others, who being within the same territory and similarly situated are entitled to like service from the carrier. The question whether the construction should be allowed or compelled depends largely upon local conditions, which the state regulating body is peculiarly fitted to appreciate. Moreover, the expenditure involved is ordinarily small. But where the proposed trackage extends into territory not theretofore served by the carrier, and particularly where it extends into territory already served by another carrier, its purpose and effect are, under the new policy of Congress, of national concern. For invasion through new construction of territory adequately served by another carrier, like the establishment of excessively low rates in order to secure traffic enjoyed by another, may be inimical to the national interest. If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension of the railroad, within the meaning of paragraph 18, although the line be short, and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks. Being an extension, it cannot be built unless the federal Commission

issues its certificate that public necessity and convenience require its construction."

See also Railroad Commission of State of California v. Southern Pacific Co., 264 U. S. 331, 44 S. Ct. 376, 68 L. Ed. 713; Colorado v. United States, 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878; Alabama Ry. Co. v. Jackson Ry. Co., 271 U. S. 244, 46 S. Ct. 535, 70 L. Ed. 928; El Dorado & W. Ry. Co. v. C., R. I. & P. Ry. Co., 5 F.(2d) 777 (C. C. A. 8); M.-K.-T. R. Co. v Nor. Okla. Rys., 25 F. (2d) 689 (C. C. A. 8).

We think the evidence in the case at bar establishes the following salient facts: that both railroads are engaged in interstate commerce; that the territory of limited area into which the proposed construction is to be projected is already occupied and served to a very considerable extent by the Rock Island; that it is entirely feasible for the whole territory to be occupied and served by the same railroad company whenever necessary; that the Missouri Pacific is at present neither occupying nor serving said territory, except with one spur track running a short distance south on Collins street; that the introduction of the Missouri Pacific into this territory will prevent the natural growth of the business of the Rock Island in said territory, and may very probably lessen its present business there; that the cost of the proposed construction will be approximately $1,000,000; that the proposed crossing will interfere to some extent at least with the efficient operation in interstate commerce of the railway tracks of the Rock Island as at present located.

When these facts are considered in the light of the principles of railway policy announced in the cases above cited, we are led to the conclusion that the proposed construction must be held to be an extension of the line of railroad of the Missouri Pacific within the meaning of paragraph 18 of section 1 of the Interstate Commerce Act as amended by the Transportation Act of 1920, § 402, 49 USCA § 1(18). A certificate of convenience and necessity from the Interstate Commerce Commission was therefore a prerequisite to the building of such extension.

A further contention by appellant is that the trial court erred in enjoining further proceedings before the Railroad Commission in respect to the proposed crossing. We think there is no merit in this contention. The crossing was part of the construction planned. There was no occasion for the crossing except as part of the whole plan. The trial court did not hold that the Arkansas Commission would have no jurisdiction to pass

upon such questions as terms of installation, operation, maintenance, apportionment of expense, etc., relative to the crossing, if the Interstate Commerce Commission granted the certificate of convenience and necessity for the construction planned; but it held that until such certificate was procured there was no crossing legally obtainable. It was therefore a waste of time and money to carry on proceedings before the Arkansas Railroad Commission until the certificate had been procured. There is nothing in the decree, at least, to prevent appellant from proceeding further before the Arkansas Railroad Commission in the crossing matter, if and when a certificate of convenience and necessity is obtained from the Interstate Commerce Commission.

We think the decree of the court below was right, and it is accordingly affirmed.