### STATE OF IDAHO et al. v. UNITED STATES et al.
### No. 12873.

District Court, D. Utah, Central Division.
March 8, 1935.

Bert H. Miller, Atty. Gen., Ariel L. Crowley, Asst. Atty. Gen., and Maurice H. Greene, of Boise, Idaho, for plaintiff.

Dan B. Shields, U. S. Atty., Salt Lake City, Utah, and Elmer B. Collins, Asst. to the Atty. Gen.

E. M. Reidy, Asst. Chief Counsel, of Washington, D. C., for Interstate Commerce Commission.

George H. Smith, Robert B. Porter, and W. Hal Farr, all of Salt Lake City, Utah, for Oregon Short Line R. R.

Before BRATTON, Circuit Judge, and JOHNSON and SYMES, District Judges.

SYMES, District Judge.

This is an action by the state of Idaho and its Public Utility Commission, against the defendants, the United States, the Interstate Commerce Commission, and the Oregon Short Line Railroad, to set aside and vacate an order of the Interstate Commerce Commission granting, on the application of the railroad company, its certificate to abandon 9.053 miles of railroad, all located within the state of Idaho. The order becomes effective fifteen months after its date. 193 I. C. C. 697.

Section 41, subd. 28, tit. 28 USCA (Jud. Code § 24, subd. 28, as amended), vests in the district courts of the United States jurisdiction of cases brought to enjoin, set aside, annul, or suspend in whole or in part any order of the Interstate Commerce Commission. Section 46, tit. 28 USCA (Jud. Code § 208), authorizes the making of the United States a party, and section 47, tit. 28 USCA (Act Oct. 22, 1913, c. 32, 38 Stat. 220), requires such suits to be heard by a three-judge court. The venue of the suit is governed by section 43, tit. 28 USCA (Act Oct. 22, 1913, c. 32, 38 Stat. 219). See, also, State of Colorado v. United States, 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878.

The case is submitted on the record made before the Commission. The facts are undisputed. Some testimony was given before this court which merely amplified evidence already in the record.

The railroad company on January 4, 1932, applied to the Commission for permission to abandon the nine miles of track in question, known as the Talbot Branch, extending from Talbot Junction, a station on applicant's St. Anthony branch southwesterly to Talbot, all in Teton county, Idaho. The application was opposed by the state of Idaho, its Public Utility Commission, and certain other interests who intervened. Hearings were held May 16 and 17, 1932, and a further hearing on December 15, 1932. The matter was orally argued on October 24, 1933, before the Commission, and on November 29, 1933, the Commission issued its certificate permitting the abandonment of regular operation effective after 30 days, and abandonment after 15 months. It is this certificate that the plaintiffs here complain of.

This line was built by the United States Railroad Administration in 1918–20 to serve the coal mines at Talbot, while the railroad was under federal control, pursuant to a contract with the owners of the mines. It runs through a mountainous, sparsely settled district in Eastern Idaho. The grade of the last two miles is over 2 per cent., and the topography forbids any further extension. The total cost was $300,000, of which the coal company agreed to pay a part, and also to furnish the right of way on the understanding that the railroad company could tear up the tracks in the event the coal company failed to supply a minimum specified tonnage. The terms of the contract resulting in the construction indicate that the line was built exclusively to serve only the mines in question. Due to a receivership and litigation, no coal was shipped over this line for the first 4 years after its completion.

On June 26, 1924, the Public Utility Commission of Idaho, on application of the coal company, and over the objection of the railroad company that this track was a branch, held it to be a spur, and ordered the railroad company to commence operations and make certain repairs, including a wye at the mine for the turning of engines, on condition that the coal company put up a bond for $27,160, the estimated cost of the wye, and that it would ship 29,920 tons

of coal a year for 5 years. This work was done as ordered, but only a little over 21,000 tons of coal was shipped during the following 5 years.

In 1927 the mine was again forced into receivership, which continued until 1931, when it was sold to a new owner, and in turn became the property of the Gem State Coal Mining Company, the present owner, subject to a judgment for $21,000 arising out of the construction of the wye. In October, 1932, the property was sold to satisfy a judgment on labor liens.

The record shows that shipments in carloads originating on this line were 935 carloads over the 9-year period, 1924–32, inclusive, all of which was coal, except 60 carloads; of which 26 were wheat, 12 hay, and 8 potatoes. No wheat has been shipped since 1928. During 1932 only 4,346 tons of coal were produced, of which 1,220 went out by truck. This district has good roads.

It further appears that at no time has there been a train schedule or regular service of any kind over this line. The railroad company maintains no buildings, loading platforms, or agents at any point on this line, and has no telegraph line, express, passenger, or mail service. Whenever the mine company desired cars, it would telephone the order over its own private telephone line to the junction, and the next triweekly train which operates over the main branch line would be stopped at the junction point, the train broken up, and empty coal cars pushed by the engine up to the mine and there spotted; the engine would then hook on to the rear of the loaded cars and back down this line to the station, the loaded cars switched into the main train, which would then resume its trip. The bills of lading for cars of coal from the mine are made out by the mine company. There are practically no shipments of any kind in the other direction; the few supplies for the mine being sent up in the empty cars as the same were ordered.

The tax returns made by the railroad to the state for the years 1919 to 1925 show that the latter did not report the line here in question as a branch line, but, on the contrary, reported it in 1923 as a spur. After the state commission had asserted its jurisdiction by the order of June 26, 1924, supra, this particular piece of track was returned by the railroad and assessed as a branch line.

Three other companies have mined very small amounts of coal near Talbot in recent years. Coal from these mines was either trucked out from the mines or loaded on wagons and hauled to Talbot and shoveled into cars. It also appears that the few farmers tributary to this line haul their produce to the main line; the only exception being that on rare occasions some merchandise broker would buy enough wheat, etc., to make a carload, and load it at a point called Dygert, halfway up the line where there was located a switch track.

The Commission, in its report, finds the above facts, and reviews at some length the mining operations in this territory, points out the physical difficulties of mining this particular coal successfully, except on a very small scale, and in regard to safety that the mine "appears to be operating under conditions that would be held unsafe in states where there are statutes regulating the operation of coal mines." And, in respect to the protestants' claim that there is a good market in Eastern Idaho for all the coal that can be produced in these mines, the Commission said such prospects were "uncertain." Both the mines and this line have always shown operating deficits.

The bill of complaint raises the only question before this court, to wit: Was the Interstate Commerce Commission without jurisdiction to hear and determine the matter, for the reason, as alleged, that the line in question was a spur, or industrial track, lying wholly within the state of Idaho, as distinguished from a branch, or extension of the line of the defendant railroad. The answer to this question depends upon the character of this piece of track. The Transportation Act of 1920 (chapter 91, § 402, 41 Stat. 456, 477, 478 [amending Interstate Commerce Act, § 1]) provides, paragraphs 18, 20, 22, 49 USCA § 1 (18, 20, 22):

"(18) * * * no carrier by railroad subject to this Act [chapter] shall undertake the extension of its line of railroad * * * unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity require or will require the construction * * * of such additional or extended line. * * *" (22): "The authority of the commission [so] conferred * * * shall not extend to the construction * * * of spur, industrial, team, switching, or side tracks, * * * to be located wholly within one State. * * *" (20): "Any construction * * * contrary to the provisions * * * of paragraph (18) * * * may be enjoined by

any court of competent jurisdiction at the suit of * * * any party in interest."

The Supreme Court in Texas & Pac. Ry. Co. v. Gulf, etc., Ry., 270 U. S. 266, 46 S. Ct. 263, 266, 70 L. Ed. 578, holds that the district courts have jurisdiction to decide the issue whether the track is an extension rather than an industrial track excepted in paragraph 22, supra. In Interstate Commerce Commission v. Union Pacific R. Co., 222 U. S. 541, 32 S. Ct. 108, 111, 56 L. Ed. 308, the court said that in determining these mixed questions of law and fact the court confines itself to the ultimate question as to whether the Commission acted within its power. "It will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling." See, also, U. S. v. New River Co., 265 U. S. 533, 543, 44 S. Ct. 610, 68 L. Ed. 1165.

This question has been before the federal courts many times, and the decisions are too numerous to cite. Each case, of course, turns upon its own particular facts. The leading case cited in support of the action of the Commission is Texas & Pac. Ry. Co. v. Gulf, etc., Ry., supra, the facts of which were wholly unlike those here presented. There the Santa Fé, without obtaining a certificate from the Commission, proposed to build into territory adjoining the city of Dallas, known as the industrial district, containing cement works, oil refineries, and metal works. This district produced a great volume of carload traffic, and all its industries were already served by, and located on, the line of the Texas Company, or connected therewith by spurs. It was not disputed that the latter railway company was affording ample railroad facilities. The Santa Fé had no line running near to or in any part of this industrial district, but proposed to build a line 7½ miles in length, including spurs, sites, and other subsidiary tracks. As the court states, manifestly, it was an attempt to compete with the Texas Company for this very lucrative business, and deprive the Texas Company of their monopoly thereof.

The court held the proposed line not a spur in the sense in which that word is commonly used; that the building of unnecessary lines, such as the one in question, involves a waste of resources, and that the proposed competition between carriers would result in harm to the public; that, when one railroad inflicts injury upon its rival, "it may be the public which ultimately bears the loss." That spur, industrial or switching tracks, etc., as defined in paragraph 22, were those commonly constructed either to improve the facilities required by shippers already served by the carriers or to supply facilities to others, who, being within the same territory, are entitled to like service from the carrier. "The question whether the construction should be allowed or compelled depends largely upon local conditions, which the state regulating body is peculiarly fitted to appreciate." The opinion then points out that, where the proposed trackage extends into territory not theretofore served by the carrier, and particularly where it extends into territory already served by another carrier, it becomes a matter of national concern.

It would seem that the undisputed facts before us require a holding that the piece of track to Talbot was merely a spur. That it was built to serve a single industry only is demonstrated by the contribution required from that industry to its original construction, and the bond exacted a few years later as a condition to the order for resumption of service and the making of certain improvements. Practically no other industry is served, nor does it extend into new territory. The fact is, the country is so sparsely settled, and the topography such, that any further extensions are not justified. So clearly it is a case of purely local, as distinguished from national, concern, which, as the court said, supra, the state body can more properly regulate.

In Abandonment of Line by Missouri Pacific R. Co., 76 I. C. C., 635, the Commission held a track 2⁹⁄₁₀ miles long to be a spur, because its sole purpose was to haul carload shipments of stone from certain quarries to the railroad's main line. And likewise in Public Convenience Application of the Western Pacific R. Co., 67 I. C. C. 135, a proposed line was held to be a spur, the sole purpose of which was to reach certain tracts of timber "not at present accessible to any line of railroad."

Most all the cases cited in support of the jurisdiction here assumed by the Commission present a state of facts similar in principle to Texas & Pac. Ry. v. Gulf, Etc., Ry., supra. In Acquisition of Line by Iberia & Vermilion R. Co., 111 I. C. C. 660, the Commission held a line 12 miles long to be a branch and not a spur, because it was to serve a large community, as distinguished from a single industry. In Detroit & M. Ry. Co. v. Boyne City, G. & A. R. Co. (D. C.)

286 F. 540, a track 3¾ miles long was held to be an extension rather than a spur. It was to be used for continuous transportation service by full trains, and was to have loading stations for use by the public for other commodities, and made competition with another railroad serving the same industry. Another instance of an extension is El Dorado & W. R. Co. v. Chicago R. I. & P. Ry. Co. (C. C. A.) 5 F.(2d) 777, in which the proposed extension was to afford a connection with the tracks of another railroad for the exchange business and operation of through trains carrying interstate freight. Another example on a similar state of facts is Missouri Pacific R. Co. v. Chicago, R. I. & P. R. Co. (C. C. A.) 41 F.(2d) 188, where the new line was to be projected across the tracks of another line, thus interfering with the latter's efficient operation, and invade territory already served by another railroad, thus lessening the latter's business.

In a late case in the Supreme Court, Texas & N. O. R. Co. v. North Side Belt R. Co., 276 U. S. 475, 48 S. Ct. 361, 72 L. Ed. 661, the Supreme Court said the purpose of paragraphs 18 to 22 of the Transportation Act was to prevent interstate carriers from weakening themselves by operating superfluous lines, and to protect them from competition by other carriers. In Alabama & V. R. Co. v. Jackson R. Co., 271 U. S. 244, 46 S. Ct. 535, 70 L. Ed. 928, the question was whether a connection between the lines of two railroad companies was an extension. The court held it was, because the proposed junction was between the main lines of two railroads and amounted to the establishment of through routes and the interchange of car services, and was but a step toward the joint use of tracks, over all of which matters the Commission had exclusive jurisdiction.

The decisions of the federal courts seem to turn on several factors, no one of which is controlling. Extensions that invade competitive territory and divide business with another carrier, that serve more than one industry, a small community, or which are used by the public generally, short pieces of track connecting two different railroads, so as to afford through lines, or joint use of tracks, or any piece of track serving a large industry or small community, the expense of operating which is so large as to be an undue burden on, or affect the ability of, the carrier to perform its duty as an interstate carrier, or lines into new territory, are factors, one or more of which are present in the cases held to require a certificate from the Interstate Commerce Commission.

None of these are present in the case at bar. During the 14 years that have elapsed since the building of this line, it has been demonstrated that the volume of traffic is inconsequential and uncertain, with no reasonable expectation that it will ever increase, or that the line will be of service to other industries or the public generally, nor is it capable of extension. We also give weight to the facts that the track was originally financed in part by a single industry, and that the order of the state commission in 1924, ordering the resumption of service, was conditioned upon the furnishing of a minimum amount of business, and a bond required to cover the cost of the new improvements. The record also shows that the financial burden on the railroad company has been negligible, in so far as it affects its ability to perform its duties as an interstate carrier.

We conclude on this record that the question before the Commission, and involved here, concerns the abandonment of a spur, or industrial track within the meaning of paragraph 22, and that the Interstate Commerce Commission lacked jurisdiction in the premises.

The order appealed from should be enjoined, set aside, and annulled, and it is so ordered.