**CHICAGO, M., ST. P. & P. R. CO. v. CHICAGO & E. I. R. CO.**

No. 10578.

United States Court of Appeals Seventh Circuit.

July 9, 1952.

Rehearing Denied Aug. 11, 1952.

John F. O'Brien, Terre Haute, Ind., Bert Beasley, Indianapolis, Ind., Thomas H. Maguire, M. L. Bluhm, J. E. Goggin, Chicago, Ill., for appellant.

David O. Mathews, Patrick C. Mullen, Chicago, Ill., Homer B. Aikman, Terre Haute, Ind., John T. Hays, Sullivan, Ind. (Hays & Hays, Sullivan, Ind., Aikman, Piety & McPeak, Terre Haute, Ind., of counsel), for appellee.

Before KERNER, FINNEGAN and LINDLEY, Circuit Judges.

FINNEGAN, Circuit Judge.

On May 28, 1951, plaintiff filed its complaint in the United States District Court for the Southern District of Indiana, Terre Haute Division, based on sec. 1 of the Interstate Commerce Act, subparagraphs 18 to 22 inclusive, 49 U.S.C.A. § 1(18–22), including the National Transportation Policy, Act of September 18, 1940, 54 U.S. Statutes at Large 899, 49 U.S.C.A. note preceding section 1, wherein it sought a decree enjoining defendant from proceeding with the construction of an extension of its line of railroad in Vigo County, Indiana, until it obtained from the Interstate Commerce Commission a certificate of public convenience and necessity, as provided in sec. 1(18) of the Interstate Commerce Act. 49 U.S.C.A. § 1(18).

The main issue presented by the pleadings was whether the track to be constructed by defendant was an extension of its line of railroad within the meaning of sec. 1(18) of the Interstate Commerce Act, for which a certificate of public convenience and necessity was required, or whether such track was a "spur", within the meaning of sec. 1(20) of the Act, for which no such certificate was necessary.

Other issues raised by plaintiff's complaint on which evidence was presented by the parties were: (a) whether the industry to be reached was in territory adjacent to, and tributary to plaintiff's line or railroad; (b) whether "such territory" could be more practically and economically afforded carrier service by the plaintiff; (c) whether plaintiff was ready, willing and able to furnish transportation service upon proper request therefor; (d) whether such track construction by defendant would entail the expenditure of large sums of money; and (g) whether such construction would invade plaintiff's territory and deprive it of revenues which would and could normally accrue to plaintiff.

The record discloses that plaintiff's line of railroad runs southeasterly through sections 28 and 33, in Vigo County, Indiana, crossing the Wabash River near the southerly line of section 28. Plaintiff and its predecessors have operated this line of road for about 50 years.

The Wabash River flows in a general southerly direction through Vigo County, Indiana, roughly bisecting sections 28 and 33, Township 13 North, Range 9 West, 2nd Principal Meridian. On or near the westerly bank of the Wabash River, in section 33, the Public Service Company of Indiana is building an electric power plant. In close proximity is the Viking Coal Mine. Prior to the filing of this suit, there was no railroad trackage connecting with any existing railroad in the area in sections 28 and 33 west of the Wabash River and south of plaintiff's railroad. Plaintiff's railroad is the nearest to the area. It is less than a mile from the property line of the power plant. Defendant's railroad extends southerly along the west bank of the Wabash River to a point in section 10, Township 14 North, Range 9 West, nearly nine miles north of plaintiff's rail line, at which point it branches. One branch of said road crosses the Wabash River running southerly at distances of one to three miles easterly of the river. From this branch one track runs westerly to the Saxton Mine,

which is east of the river and about one and a quarter miles east of the Viking Mine. The Saxton and Viking Mines are connected underground. An underground conveyor carries coal from the Viking Mine to the Saxton Mine tipple from where it has been shipped over defendant's railroad. Defendant's first contact with the coal is at the tipple of the Saxton Mine.

The second branch of defendant's line extends along the west bank of the Wabash River to a point near the north line of section 16, Township 13 North, Range 9 West, a distance of over two miles north of plaintiff's road. In its annual report to the Public Service Commission of Indiana in 1950, defendant classified this as a branch line. It is known as "Hunt's Spur" or "Hunt's Switch."

For forty years, defendant was the owner of a right of way running about one and one half miles southerly from its existing trackage. In 1936 this trackage was abandoned. Immediately south of this was a strip of right of way about three fourths of a mile long, which defendant purchased in 1902. This strip reverted to the original grantors in 1904. Further south were two disconnected strips of right of way, each about one fourth of a mile long, which were purchased by defendant in 1902 and were sold by it in 1949. At no time was trackage built on any of this right of way south of a mine located between two and three miles north of plaintiff's road. All right of way located south of defendant's existing trackage, except that part abandoned in 1936, was acquired by defendant after it had entered into its agreement with the Power Company, hereinafter discussed.

In 1950, the Power Company discussed with the plaintiff, the defendant and the Pennsylvania Railroad separately the question of the terms and conditions under which these railroads would construct track connections to serve the power plant. The Pennsylvania Railroad offered to construct the necessary trackage for a rental of $72,000 per year, to be paid by the Power Company. Plaintiff, by written memorandum, offered to advance the cost of construction and to accept a non-interest bearing note from the Power Company to cover the cost, subject to credit in specific amounts for each car of freight moving over the trackage, instead of requiring the Power Company to advance the cost of trackage lying outside plaintiff's right of way, subject to refunds for such cars of freight.

The Power Company's vice-president testified that while his company was willing that part of the proposed trackage be used to serve the Viking Mine it could not, because of the anticipated volume of traffic into its own plant, agree to that part of the memorandum providing that plaintiff's easement for the use of the trackage should "include the right to serve any industry from an extension of or connection with such trackage." This offer was rejected by the Power Company.

On December 19, 1950, the defendant agreed with the Power Company to construct the trackage at its own expense as far as the power plant's hopper site. It was also agreed that the defendant should "have the right, at any time, to use the whole or any part of said tracks, for the purpose of serving other industries, or for any other purpose, provided such use shall not unreasonably interfere with the use thereof by the industry."

Shortly after December 2, 1950, defendant had commenced and completed certain trackage on the Power Company property, between a point south of the right of way of plaintiff and the site of the power plant. North of plaintiff's right of way, no work was done in furtherance of the track connection, except to clear away some trees and brush.

On May 4, 1951, the Public Service Commission of Indiana issued an order on defendant's petition under an Indiana Statute authorizing defendant to construct a crossing over plaintiff's track.

It is alleged in the complaint and admitted by defendant that the latter has not obtained a certificate of public convenience and necessity from the Interstate Commerce Commission for the trackage from

defendant's existing line to the hopper site of the power plant, a distance of approximately 3.15 miles.

The plaintiff estimated that the cost of constructing the proposed trackage would be about $500,000, while defendant's estimate was $315,000.

Defendant contended in the District Court that the trackage involved is a "spur" track and not under the authority of the Interstate Commerce Commission; that it has for about twenty years held itself out "to serve any mines or industry in the area off the Hunt's Switch"; that it will not provide passenger service over the proposed trackage; that no express or mail service will be provided; that no stations, agents, loading platforms, nor telephone or telegraph service will be provided; that all traffic will be inbound shipments to the Power Company plant; and that the trackage would not be constructed except for the power plant now under construction.

The District Court made elaborate findings of fact, reached the conclusion that the trackage constituted a "spur" within the meaning of the statute, title 49 U.S.C.A. § 1 (22), and dismissed the complaint at plaintiff's costs.

In this court the plaintiff-appellant contends that the proposed trackage is an extension of the defendant-appellee's line of railroad; that the trial court erred in holding that such trackage constituted a "spur" or "industrial" track; and that the judgment should be reversed and the cause remanded with directions to grant the relief sought in the complaint.

We have examined the record and are satisfied that the detailed facts found by the District Court are each and all supported by substantial evidence. The only finding questioned in this court is the ultimate one that the trackage involved constituted a "spur" or "industrial" track. Consequently, the question for us to answer is whether or not under the facts found, the proposed trackage constitutes an extension of defendant's railroad as the plaintiff-appellant contends, or whether the trackage is merely an "industrial" or "spur" track.

The appellant relies heavily upon Texas & Pacific R. R. Co. v. Gulf, C. & S. F. Ry. Co., 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed 578. That case was decided in 1926. The Santa Fe proposed to build new trackage for the purpose of reaching an industrial district which extended 2½ miles along the tracks of the Texas and Pacific. The proposed trackage was to extend generally into territory served by the Texas and Pacific, and the effect of its construction would be to raid the established traffic of that railroad. In the case at bar the appellant, Milwaukee R. R., does not furnish service to any industry south of its present right of way. As a matter of fact, the only industry in that territory, Viking Coal Company, is served by the C. & E. I. R. R., defendant-appellee, as we have explained. So far as this record shows, the proposed plant of Public Service Company and the Viking Mine are the only industries at present located in the area in question, and there are no communities located in said area.

In Missouri Pacific R. R. Co. v. Chicago R. I. & P. Railway, 8 Cir., 41 F.2d 188, decided in 1930, the Missouri Pacific was attempting to tap a territory which was already being served by the Rock Island. The case of Marion & Eastern R. R. Co. v. Missouri Pacific R. R. Co., 318 Ill. 436, 149 N.E. 492, decided in 1925, is also distinguishable from the case here under consideration. In the Illinois case the plaintiff seeking the injunction had already built trackage to within 200 feet of the industry to be served, and had also brought in material necessary to complete the trackage prior to the time at which the Missouri Pacific undertook to construct trackage to the same industry.

The latest case to which we are referred is Jefferson County v. Louisville & N. R. Co., Ky., 245 S.W.2d 611, decided on December 21, 1951. There the defendant, L. & N. R. R. proposed to build 5¾ miles of track from a railroad yard to the site of an industrial plant about to be constructed by General Electric Company. The plant site was also to be served by another railroad. The court denied an injunction sought to prevent the construction until a certificate

had been obtained. The court, after consideration of the case of Texas & Pacific R. R. Co. v. Gulf, C. & S. Fe Ry. Co., 270 U.S. 266, 46 S.Ct. 263 said:

"We think the cases of State of Idaho v. United States, D.C., 10 F.Supp. 712, 715, and Missouri, K. T. R. Co. v. Texas & N. O. R. Co., 5 Cir., 172 F.2d 768, are more nearly in point with this case. In the Idaho case it was held that a railroad track nine miles in length, built to serve a single industry, was a 'spur' or 'industrial' track within the meaning of the Federal statute. In that case the Court said: 'Each case, of course, turns upon its own particular facts.'

"In the Missouri, K. T. R. Co. case it was held that a proposed line of track 5000 feet in length across a two-square mile area near a city, to serve three or four industries and to be built in accordance with promises inducing industries to locate in that area, was not an 'extension' of the railroad's line, but was a 'spur' or 'industrial' track.

"Under the circumstances of this case, we are of the opinion the proposed new track is a 'spur' or 'industrial' track within the meaning of the Federal Transportation Act, and that it is not necessary that the Company obtain a certificate of public convenience and necessity before constructing the line." [245 S.W.2d 615.]

State of Idaho v. U. S., D.C., 10 F.Supp. 712, affirmed in 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070, involved the so-called Talbot "branch" of the Oregon Short Line Railroad. The District Court entered a decree setting aside and enjoining action under a certificate of the Interstate Commerce Commission, purporting to permit the railroad company to abandon the trackage in question.

The Supreme Court said, 298 U.S. on page 108, 56 S.Ct. on page 692:

"The Oregon Short Line has never maintained a train schedule or regular service over this trackage; has never furnished express, passenger, or mail service; has maintained no buildings, loading platforms, or agent at any point along the trackage; and has had no telegraph or telephone line in connection therewith. Bills of lading for cars of coal are made out by the mine company. There are practically no shipments in the opposite direction; the few supplies for the mine being sent up in the empty coal cars when ordered.

"The District Court concluded that the Talbot branch was constructed and has been maintained for the purpose of serving a single industry; that practically no other industry is served; that this trackage does not invade new territory; that its continued operation or abandonment is of local and not of national concern; that it is therefore a 'spur'; and hence, that the order of the Interstate Commerce Commission was in excess of its jurisdiction. * * *

"The decree should be affirmed, because on findings amply supported by the evidence the trackage is a spur. * * *"

In the case of Missouri, K. & T. R. Co. of Texas v. Texas & N. O. R. Co., 5 Cir., 172 F.2d 768, decided in 1949, the Court declined to enjoin the Texas & New Orleans from building tracks crossing the tracks of the M. K. & T. into an area the Court characterized as "virgin territory." In the case at bar the position of the defendant, C. & E. I., is much stronger than that of the Texas & New Orleans in the M. K. & T. case. The District Court here found that C. & E. I. has held itself out to serve, and has actually served, all mines and industries seeking rail service, including the Viking Mine, in the area immediately adjacent to the proposed site of the Public Service Company's new plant.

Under the facts and circumstances disclosed in this record, we are of the opinion that the District Court properly concluded that the trackage in question constituted a "spur" or "industrial" track, and properly denied to plaintiff the injunctive relief which it sought.

The order of the District Court, dismissing the action at plaintiff's cost, is affirmed.